# In the United States Court of Federal Claims

No. 05-1113 C
(Filed: July 30, 2012)

*************************************

| | | |
|---|---|---|
| CATEL, INC., | * | Trial decision; Contract Disputes Act of |
| | * | 1978; Equitable Adjustment; No Excusable |
| Plaintiff, | * | Delay; No Breach of Implied Duty of |
| | * | Good Faith and Fair Dealing; Failure to |
| v. | * | Rebut Presumption of Good Faith; Failure to |
| | * | Establish Constructive Changes; 48 C.F.R. |
| THE UNITED STATES, | * | § 52.249-10; Liquidated Damages Properly |
| | * | Assessed; Offset of Additional Costs |
| Defendant. | * | Incurred to Complete Contract Justified |

*************************************

James S. DelSordo, Manassas, VA, for plaintiff.

Gregg M. Schwind, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In May 1996, the United States Navy ("Navy") awarded to plaintiff Catel Inc. ("Catel") a contract for construction of a Fleet Recreation Center on a pier located in New Jersey. Numerous issues arose concerning Catel's ability to complete the contract on schedule. Although the Navy issued several contract modifications that increased the contract price and extended the project completion date to September 1997, the Fleet Recreation Center remained under construction throughout 1998. Catel accused the Navy of interfering with its contract performance and delaying project completion. The Navy threatened to terminate the contract for default but ultimately permitted Catel's surety, Ranger Insurance Co. ("Ranger"), to assume contract management responsibilities. Ranger's involvement, however, did not ameliorate the situation, and the Navy again threatened to terminate the contract for default.

Catel represented to the Navy in August 1998 that it fully and completely satisfied its contractual obligations, but the Navy contended that Catel remained responsible for correcting several deficiencies and completing the contract. When the Navy took occupancy of the Fleet Recreation Center in September 1998, it discovered additional deficiencies and expected Catel to correct and complete its work. When the parties failed to resolve their differences, the Navy hired another contractor to correct Catel's work and complete the Fleet Recreation Center.

Catel submitted a final invoice to the Navy seeking payment for the remaining contract balance. The Navy declined to remit payment because, it contended, liquidated damages and other offsets exceeded that balance. Catel submitted a claim to the contracting officer, who issued a final decision denying the claim in its entirety. Thereafter, it filed suit in the United States Court of Federal Claims ("Court of Federal Claims") under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-613 (2000),[1] challenging the contracting officer's denial of its claim and seeking the unpaid contract balance plus reimbursements for liquidated damages, expenses incurred from Ranger, and legal fees.

A three-day trial was held in Newark, New Jersey, during which the court heard testimony from Benjamin Golaszewski and Telmo Pires on behalf of Catel, and Ensign Gregory Miller and Ralph Tinari on behalf of the Navy. The court also requested and heard testimony from James Coffey, president of Coffey Electric Inc., one of Catel's subcontractors who performed work at the Fleet Recreation Center. The parties declined closing argument following submission of their posttrial briefs.

For the reasons explained below, Catel's claim is without merit and is denied in its entirety. The evidence at trial established that the Navy properly administered the Fleet Recreation Center contract and Catel was solely responsible for failing to timely complete contract performance.

## I. FINDINGS OF FACT[2]

### A. Solicitation for Construction and Rehabilitation Work at the Earle Naval Weapons Station

The Fleet Recreation Center is part of the Earle Naval Weapons Station in Colts Neck, New Jersey. DX 1, 12. The pier on which the Fleet Recreation Center is located extends into the Atlantic Ocean and takes the shape of a trident, enabling the Navy to dock, load, and offload ships. DX 447-51. The Fleet Recreation Center is situated on the pier at the point where the trident "prongs" converge. DX 447, 451.

---

[1] Recently, Congress revised and recodified title 41 of the United States Code in order to "remove ambiguities, contradictions, and other imperfections . . . ." Pub. L. No. 111-350, 124 Stat. 3677 (2011). All further citations in this opinion are to the current version of the CDA, which is now codified at 41 U.S.C. §§ 7101-7109 (Supp. IV 2006).

[2] This recitation of facts constitutes the court's principal findings of fact in accordance with Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC"). Other findings of facts are set out in the discussion. Plaintiff's exhibits are denoted as "PX" and defendant's exhibits are denoted as "DX." References to the trial transcript are by page and witness.

In 1994, the Navy decided to convert an abandoned fire station located on the Earle Naval Weapons Station pier into a recreation center.  DX 232.  Naval Facilities Engineering Command Northern Division ("NAVFAC") designed the Fleet Recreation Center and was responsible for awarding and administering the contract to renovate and rehabilitate the fire station.  Id.  The Navy issued a solicitation for this work in August 1995.  DX 12, 16.

The Fleet Recreation Center project included renovation of the fifty-year-old fire station and construction of an addition to the structure.  DX 12, 24, 147, 232.  The Earle Naval Weapons Station's Morale and Welfare Recreation Department ("MWRD") intended to utilize the Fleet Recreation Center as a place for younger service members living on naval vessels to spend their off-duty hours and congregate for recreational and relaxation activities.  Tr. 659:6-660:8 (Miller), 869:20-22 (Tinari).  Amenities envisioned for the Fleet Recreation Center included a game room, lounge, locker rooms, and computer/reading rooms.  DX 232.  The MWRD planned to furnish the Fleet Recreation Center with pool tables, video games, vending machines, televisions, and other items for use by Navy personnel.  Id.

The procurement was set aside for small disadvantaged businesses, DX 12, and was conducted under sealed bidding procedures, DX 1.  Award of a contract was contingent upon available funding.  DX 24.  Given the nature of construction work, the Navy anticipated that contract modifications would be necessary.  Id.; accord Tr. 932:10-12 (Tinari) (acknowledging that the Navy "expect[ed] some type of unforeseen changes in a renovation contract").  The Navy reached its funding limitation for the contract and therefore lacked contingency funding.  DX 24.  As a result, the Navy planned to delete work on the new construction portion of the project if, during contract performance, unforeseen work became necessary.  Id.

The solicitation advised offerors that the Fleet Recreation Center contract incorporated the liquidated damages provision set forth in Federal Acquisition Regulation ("FAR") 52.212-5:

> (a)  If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $250, for each day of delay.

> (b)  If the Government terminates the Contractor's right to proceed, the resulting damage will consist of liquidated damages until such reasonable time as may be required for final completion of the work together with any increased costs occasioned the Government in completing the work.

> (c)  If the Government does not terminate the Contractor's right to proceed, the resulting damage will consist of liquidated damages until the work is completed or accepted.

DX 12 (setting forth 48 C.F.R. § 52.212-5 (2005)).  The contract also contained the default clause set forth in FAR 52.249-10, DX 12; see infra Part III.D.1, and incorporated by reference

the warranty of construction clause set forth in FAR 52.246-21(c), DX 12, which provides, in part:

> The Contractor shall remedy at the Contractor's expense any failure to conform, or any defect.  In addition, the Contractor shall remedy at the Contractor's expense any damage to Government-owned or controlled real or personal property, when that damage is the result of–
>
> (1) the Contractor's failure to conform to contract requirements; or
>
> (2) Any defect of equipment, material, workmanship, or design furnished.

48 C.F.R. § 52.246-21(c)(1)-(2).

## B.  Contract Award

Catel is owned by Mr. Pires, who established the business in 1981 and serves as its president.  DX 1, 17; Tr. 236:4-11 (Pires).  Catel is classified as a small disadvantaged business and had experience serving as a general contractor on federal government projects before it participated in the Fleet Recreation Center procurement.  Tr. 236:15-25, 240:14-241:16 (Pires).  Catel previously performed work at the Earle Naval Weapons Station and was familiar with the pier.  Id. at 239:24-240:3, 460:12-24 (Pires).

The Navy furnished to Catel all of the specifications and drawings for the Fleet Recreation Center contract so that Catel could submit a proposal.  Id. at 457:11-14 (Pires).  In December 2005, Catel participated in the Fleet Recreation Center procurement.  DX 1, 17.  Glenn Goebel, who served as Catel's vice president, prepared Catel's proposal.  Tr. 238:5-7 (Pires); DX 12.  Prior to contract award, Mr. Pires confirmed to NAVFAC that he "thoroughly underst[ood] the reference specifications and related plans" set forth in the solicitation and verified Catel's bid price.  DX 17.  Between February and May 1996, Catel, on three separate occasions, extended the dates to which it guaranteed its bid price.  DX 18-20.

On May 16, 1996, the Navy awarded Contract No. N62472-95-C-0448 to Catel.  DX 1, 198.  The contract price at the time of award was $503,980, and the original contract completion date was January 26, 1997.  DX 1-2.

NAVFAC delegated contract administration functions to the local NAVFAC office at the Earle Naval Weapons Station.  DX 16.  Mr. Tinari served as NAVFAC's supervisory civil engineer, and Lieutenant Andrew C. Wood was the project manager for the Fleet Recreation Center contract.  DX 22-23.  Both Mr. Tinari and Lieutenant Wood worked for the office of the Resident Officer in Charge of Construction ("ROICC") at the Earle Naval Weapons Station.  Id.  During a career spanning twenty-three years at the Earle Naval Weapons Station, Mr. Tinari supervised and worked with approximately thirty project managers.  Tr. 925:10-926:3 (Tinari).

4

After Lieutenant Wood left the Navy in April 1997, Ensign Miller assumed project management responsibilities for the Fleet Recreation Center contract.  DX 65.  Mr. Tinari characterized Ensign Miller's performance in his role as project manager as "outstanding" and considered him one of the top three project managers with whom he worked.  Tr. 926:14-927:3 (Tinari).

Mr. Golaszewski served as Catel's project manager, id. at 19:24-20:10 (Golaszewski), as well as its quality control manager/superintendent, id. at 793:21-22 (Miller); DX 32.  Mr. Golaszewski began working in the construction industry in 1979 and became involved in government contract administration in the mid-1980s.  Tr. 21:4-5, 22:13-16 (Golaszweski).  Catel represented to the Navy that Messrs. Pires and Golaszewski would personally manage the Fleet Recreation Center project.  DX 29.

### C.  Catel's Responsibilities Under the Contract

Catel, as the prime contractor, bore the responsibility of coordinating all construction for the Fleet Recreation Center project.  DX 61; Tr. 624:4-7 (Miller).  In this capacity, Catel was required to, among other things, (1) check all drawings, (2) compare all drawings and "verify . . . figures before laying out the work," and (3) notify the contracting officer of any discrepancies.  DX 12.  Catel was solely responsible for "any errors" that could have been avoided if it properly fulfilled these obligations.  Id.

Catel was also responsible for quality control by "self-inspect[ing]" the project to make sure construction proceeded in accordance with contract specifications.  Tr. 871:10-872:9 (Tinari); see also DX 12 (setting forth a "Quality Control" section that enumerated the contractor's obligations).  As Catel's quality control manager/superintendent, Mr. Golaszewski was expected to validate contract drawings and specifications with each subcontractor.  Tr. 624:21-25 (Miller).  NAVFAC was responsible for performing "spot check[s]" on the job site in order to ensure that Catel was properly maintaining its quality control program.  Id. at 871:16-872:5 (Tinari).

### D.  Catel's Contract Performance

The Navy held a preconstruction conference with Catel on June 6, 1996.  DX 22.  Lieutenant Wood conducted the conference, Tr. 22:25 (Golaszewski), during which the parties discussed contract administration, labor standards, construction safety, applicable regulations, and issues unique to the pier and construction site, DX 22.  The Navy also answered any questions Catel had about the Fleet Recreation Center project.  Id.  Construction was set to commence on June 24, 1996, provided that Catel furnished all necessary documentation, which included performance and payment bonds, insurance verification, and quality control and safety plans.  DX 23.

### 1. Removal of Additional Lead Paint and Asbestos

Catel did not begin construction until August 1, 1996, at which time it expressed concern about the potential presence of additional asbestos and lead paint in the fire station. DX 25, 32, 198. Further testing confirmed that asbestos and lead paint existed in greater amounts than previously identified. DX 25, 32; see also DX 39 (indicating that an additional 2,000 square feet of lead-based paint was discovered). This "change[d] condition in the field," Tr. 880:17 (Tinari), required the Navy to modify the contract and provide for additional asbestos and lead paint removal and disposal, DX 26, 28. On September 16, 1996, the parties executed Modification P00002, which added the additional abatement work, increased the contract price by $23,250, and extended the contract completion date to March 27, 1997. DX 3, 198.

On November 22, 1996, the Navy informed Catel that it failed to remove and dispose of all 2,000 square feet of lead-based paint as required by Modification P00002. DX 39. It explained that Catel only removed peeling and flaking paint on several interior walls, adding: "[a]lthough not in violation of any health and safety requirements, the procedure [was] not in compliance with the contract requirements and [left] a future liability for the station to deal with." Id. The Navy further advised Catel that it would accept the variance "provided that an appropriate price adjustment [was] made" because the negotiated price set forth in Modification P00002 contemplated complete removal of lead paint. Id. It determined that a $3,000 credit was appropriate. Id. Catel conceded that it did not remove "approximately 25% of the total 2000 square feet of lead paint," but it contested the $3,000 credit, arguing that its subcontractor performed "considerable work" to remove some of the lead paint. DX 41.

### 2. Timeliness of Catel's Submittal Transmissions to the Navy

Catel was required to transmit submittals in a timely and orderly sequence before it could proceed with work. DX 12; Tr. 888:15-17 (Tinari). Work was not authorized until the Navy approved a submittal pertaining to that work. DX 30. Although the Navy could approve certain submittals at the ROICC office, other submittals required initial review by Ewing Cole Cherry Brott ("Ewing Cole"), the Navy's outside architectural and engineering firm. DX 12, 30. Once Catel transmitted a submittal, the Navy was required to "process it in accordance with the time required in the contract" in order to "provide an answer . . . on whether [the submittal was] approved, or disapproved, or approved as noted on that particular submittal." Tr. 888:20-24 (Tinari). Construction delays would result if the Navy was not furnished submittals in a timely manner. Id. at 889:13-14 (Tinari).

Catel's failure to transmit submittals to the Navy in a timely manner plagued its contract performance from "the beginning of the contract . . . ." DX 147. Lieutenant Wood first expressed concern about Catel's submittals in October 1996, stating:

> In comparing the project schedule with submittals in hand, it is quite apparent that delays will be experienced in the upcoming scheduled activities. There are

numerous submittals that require [Ewing Cole] review prior to executing the work
or purchasing material but have not been submitted to this office. . . .

　　　　. . . Staying on top of the submittals and preventing them from delaying
your work requires a concerted effort on your part in which I can only do so much
to speed the review process along.

DX 30.  Catel explained that it made "a continuous effort striving to complete the submittals
which [we]re required under the contract."  DX 32.  Mr. Golaszewski attributed Catel's delays to
the Navy's funding issues and the additional time required for asbestos and lead paint abatement.
Id.

　　　　The timeliness of Catel's submittals remained an issue.  In May 1997, Ensign Miller
expressed concern about Catel's construction schedule and submittal log.  DX 73.  He identified
seven submittals that required Navy or Ewing Cole approval before work could commence and
advised Catel that these submittals "need[ed] to be submitted . . . as soon as possible in order to
not interfere with [Catel's] construction schedule."  Id.  In June 1997, Ensign Miller requested
Catel's progress schedule.  DX 80.  When Catel failed to respond to his request, Ensign Miller
made a second request.  DX 84.  Ensign Miller also requested a meeting with John Parisik, who
was serving as Catel's alternate quality control manager/superintendent, to review Catel's
submittal log and resolve discrepancies between the Navy's log and Catel's log.  Id.  Catel
ultimately did not submit a progress schedule by the date requested by the Navy.  DX 147.

　　　　Catel then attributed its delays in transmitting submittals to Ensign Miller, stating that he
was not rendering submittal decisions.  DX 80.  Catel also blamed the Navy for modifying the
contract's scope of work.  Id.  Ensign Miller rejected these arguments, explaining that the Navy
did not modify the scope of work and he was not delaying the issuance of decisions.  Id.  Ensign
Miller noted that Catel failed to maintain its submittal log, and he questioned whether Catel
received government approval prior to commencing certain work.  Id.  He directed Catel to
furnish "submittal cover letters with the [Ewing Cole] approval stamp to [his] office as soon as
possible" as proof that the Navy authorized work.  Id.

　　　　In mid-June 1997, Catel informed the Navy that it was still reviewing its files in order to
produce an accurate submittal log.  DX 92.  Issues related to Catel's submittals continued
throughout July, August, and September 1997.  See DX 108, 118, 123.  Finally, in mid-October
1997, the Navy requested bimonthly meetings with Mr. Golaszewski to review the status of
Catel's submittals.  DX 174.

　　　　In November 1997, the Navy identified a list of 180 submittals that either Catel never
transmitted or were not approved by the Navy.  DX 192.  Catel was reminded that any work not
approved by the Navy was performed at Catel's own risk.  Id.  On November 17, 1997, the Navy
advised Catel that it would no longer permit work on the project "without the necessary approved
submittals or out of normal construction sequencing."  DX 204.  Ensign Miller then identified

twenty-seven submittals that were not yet approved by the Navy and required Catel's attention.
DX 204.  He advised Catel that the Navy would suspend work and issue a noncompliance notice
if Catel performed work out of sequence or without an approved submittal.  Id.

In January 1998, Ensign Miller identified several issues with Catel's submittals and noted
that Catel, once again, fell behind schedule.  DX 234.  First, Catel failed to transmit twenty-eight
submittals that Cashin Associates, P.C. ("Cashin"), a construction management firm hired by
Ranger after it was asked to step in and manage the contract, see infra Part I.D.13, represented
Catel would furnish by the beginning of the month.  DX 234.  Second, Ensign Miller notified
Catel that thirteen submittals had been disapproved and required resubmission.  Id.  Third,
Ensign Miller advised Catel that it failed to provide copies of approved transmittal sheets for
submittals Cashin had previously identified as approved.  Id.  Fourth, Ensign Miller indicated
that Catel never resubmitted certain submittals that had been returned as disapproved.  Id.

Catel responded and asserted that the Navy failed to render a decision on many of the
submittals at issue.  DX 241.  Catel accused the Navy of bias, claiming that the Navy
"continually" lost, misdirected, or disapproved submittals that had already been approved.  Id.
Although Catel provided additional information to the Navy several days later, DX 243, the Navy
noted that Catel had not, in fact, furnished copies of "the majority" of the submittals at issue.
DX 246.

In a January 14, 1998 letter to NAVFAC, Catel's attorney, Robert T. Lawless, addressed
a variety of issues, including the Navy's frustration with and concern about Catel's submittals.
DX 251.  According to Mr. Lawless, Ensign Miller's position was "inaccurate" and his concerns
reflected the Navy's "most recent effort" to interfere with contract completion.  Id.  Mr. Lawless
accused Ensign Miller of "unnecessary 'micro-management'" and asserted that many of the
submittals in question had been approved by the Navy.  Id.  The Navy determined that Mr.
Lawless's assertions were baseless.  DX 256-57.

In June 1998, Ensign Miller informed Catel that its failure to submit four weeks of daily
reports necessitated issuance of a noncompliance notice.  DX 316.  Ensign Miller indicated that
Catel would receive a noncompliance notice on "every other working day until the required Daily
Reports [were] submitted to this office."  Id.  Catel received another noncompliance notice for its
failure to submit daily reports in late June 1998.  DX 339.  The Navy acknowledged receipt of
the daily reports in question in early July 1998.  DX 344.

### 3.  Structural Steel Elevation and Parapet Wall Issues

Catel was required to construct a new roof for the Fleet Recreation Center.  As part of the
roof installation, Catel needed to install structural steel.  Tr. 612:22-24 (Miller).  The steel
elevation for the new construction portion of the project had to be flush with the steel elevation
on the existing fire station in order to accommodate one metal roof over the complete structure.
Id. at 612:35-613:2-8 (Miller).  In order to construct one roof, the roof trusses needed to be set at

the same elevation.  Id. at 613:7-8 (Miller); see also id. at 892:23-893:10 (Tinari) (describing how roof installation required the steel elevation on the existing fire station to match the steel elevation on the new construction).

On October 29, 1996, Catel's truss subcontractor informed Catel that it could not install roof trusses due to a problem with the structural steel elevation.[3]  DX 33.  The truss subcontractor noted that "EVERY drawing says the steel should be flush" and explained that "[s]omething [was] obviously wrong when supposedly level steel pitches an inch on thirty+ feet."  Id.  Catel was advised to contact the steel subcontractor and require it to return to the job site and correct its work.  Id.

Catel was already forty-five days behind schedule when it was apprised of the structural steel elevation discrepancy.  DX 512.  On November 7, 1996, Catel informed the Navy that an issue with the structural steel elevation was causing construction delays.  DX 36.  Catel attributed the delays to the Navy.  Id.  It also claimed that several outstanding issues, including the structural steel issue, precluded it from ordering materials and scheduling subcontractors.  Id.  The parties convened to discuss these issues, and Lieutenant Wood later addressed each issue in writing.  DX 37.  Lieutenant Wood explained why each issue raised by Catel had no effect on Catel's project schedule.  Id.  He also informed Catel that these issues did not preclude Catel from performing and completing a "significant amount of work."  Id.

Catel submitted roof truss drawings to Ewing Cole for review.  See DX 43.  Lieutenant Wood apprised Catel on December 13, 1996, that its submissions were incomplete because they failed to include drawings needed to "review the trusses for compliance with the contract" and to ensure that the trusses fit within the existing steel frame.  Id.  On December 18, 1996, Catel informed the Navy that there was "a 9½[-inch] difference in field measurements" between the top steel elevation on the existing building and the new construction.  DX 44, 200.  Catel cited one page of the technical drawings, which indicated that the elevation was 24.5 inches, as the source of the discrepancy and noted that another page indicated the elevation was 25.4 inches.  DX 44; see also DX 12 (containing the specification page with the purported discrepancy).

Several weeks later, Catel submitted additional information to Lieutenant Wood and characterized the structural steel elevation discrepancy as "no[th]ing more than a typographical error."  DX 52.  Nevertheless, Catel claimed the error "caused a problem in the field" for its contractors.  Id.  One subcontractor, Daak Corp., advised Catel that the "building ha[d] been changed from the original drawings" and that its scope of work increased.  DX 45.  Catel

---

[3]  A second copy of the truss subcontractor's letter was admitted into evidence.  DX 42.  On this copy, the October 29, 1996 date was crossed out and replaced with a handwritten note: "Resent this should have been dated 12-2-96, sorry."  Id.  The annotated copy was intended to show that the structural steel elevation issue arose in December 1996.  However, the evidence demonstrates that the structural steel elevation issue was first "discovered in mid Oct[ober 19]96."  DX 512.

requested an equitable adjustment based upon Daak Corp.'s claim that it incurred additional costs to perform additional work.  DX 52.

Lieutenant Wood confirmed the existence of a typographical error in the specifications but explained it was "obvious that the '5' and the '4' were transposed" and the measurement "should have indicated 24'5" as [was] indicated everywhere else in the plans."  DX 53.  He added: "The fact that an isolated typographical error exist[ed] d[id] not necessarily and automatically relieve Catel of its liability in this issue."  Id.; see also id. (explaining that the error was "not carried through the entire set of the plans"), DX 61 (same).  Moreover, Lieutenant Wood advised Catel that the specifications

> require[d] that the existing conditions . . . be verified in the field prior to ordering any materials or commencement of work.  This [direction,] combined with the fact that the elevations [were] given with a '±' caveat[,] mandate[d] field verification prior to ordering the steel.  Such preliminary verification would have certainly identified this typographical error.  [Catel's] failure to question the discrepancy or to perform the necessary preliminary field verification [was] also a direct cause to the matter.

DX 53.  The Navy reminded Catel of its contractual responsibility "to coordinate the work in accordance with the complete set of plans and specifications" and "to field survey/verify the existing building dimensions, compare all the drawings, and to notify [ROICC] of any discrepancies . . . ."  DX 61; see also Tr. 894:20-895:4 (Tinari) (explaining that the contractor must "look at the entire . . . plans and specifications" and not rely on one specific area where a specification may be incorrect).

Catel acknowledged its contractual responsibilities in a letter dated January 13, 1997.  DX 55.  Nevertheless, Catel justified its actions by stating that it followed a "rule of thumb" by "always follow[ing] the structural drawings."  Id.  Two weeks later, Catel, seeking to bolster its position, cited to provisions from a steel construction guide it characterized as a "bible for all engineers and architects."  DX 56.  Catel reiterated that it made additional payments to Daak Corp. "because of discrepancies in the plans/drawings," id., and claimed entitlement to an equitable adjustment, DX 55-56, 59.

The Navy, on February 11, 1997, requested that Ewing Cole review the parties' correspondence and present its "position regarding liability" for the structural steel elevation issue.  DX 57.  Ewing Cole explained that Catel was obligated to "install all roof framing steel at the same elevation; this include[d] steel framing above the existing building and steel framing above the new addition in order to be in conformance with the structural plans . . . ."  DX 58.  Catel, Ewing Cole concluded, "did not follow the structural drawings and installed half the steel at one elevation and half at another elevation."  Id.; see also DX 33 (setting forth the truss subcontractor's position that "EVERY drawing says the steel should be flush").  The discrepancy could have been avoided, Ewing Cole observed, if Catel "coordinated the drawings properly and

10

confirmed the details with the existing conditions in the field as required." DX 58.

Catel acknowledged that the structural steel elevation issue also caused a parapet wall shortfall, resulting in a ten-inch gap around the perimeter of the new construction. DX 59, 61. This gap meant that the soffit on the new construction was disconnected from the fire station, see Tr. 614:22-23 (Miller), and additional work was needed to remedy the issue, DX 59. The Navy determined that "responsibility for correcting this situation [was] tied completely to the resolution of the modified truss matter." DX 61.

### a. Catel's Request for Additional Time

Lieutenant Wood recounted discussions between the Navy and Catel concerning the structural steel issue and other issues, including the discovery of structurally unsound steel that needed repair, in a February 25, 1997 memorandum. DX 512. He calculated that a sixty-day contract extension–thirty days for actual work and thirty days for impact to the construction schedule–adequately compensated Catel for delays associated with the trusses and structural steel elevation issue. Id. Catel, however, objected to a sixty-day extension, contending that an additional 150 days was required. Id. Lieutenant Wood deemed Catel's request for an additional 150 days unreasonable. Id.

Catel then maintained that an extension of at least 120 days was required so that it could schedule subcontractors. Id. Catel asserted that, due to delays, it needed to hire new subcontractors because its original subcontractors were no longer available to perform work. Id. Ultimately, Lieutenant Wood recognized that there were "intangible impacts that probably should be accounted for" in a revised schedule. Id. He proposed an extension of ninety days. Id. Then, in an effort to resolve the parties' disagreement, Lieutenant Wood concluded that an additional 120 days, later enlarged to 124 days, would "definitely make [Catel] completely whole with respect to all possible issues associated with the structural repairs and roof truss elevation problem." Id. He also acknowledged that the "matter of contractor delay, [government] delay, and concurrent delay [was] very cloudy." Id. On March 6, 1997, the parties executed Modification P0004, which increased the contract price by $30,000 and extended the contract completion date by an additional 124 days, to August 1, 1997. DX 5, 512.

### b. The Navy's April 2, 1997 Letter of Direction

Although the Navy granted Catel an extension of time, the parties still had not determined liability for the additional costs associated with the structural steel elevation and parapet wall issue. Catel, Lieutenant Wood, and Ensign Miller participated in a meeting on April 1, 1997, but no agreement was reached. DX 69; Tr. 614:7-12 (Miller). The next day, the Navy issued to Catel a contracting officer's letter of direction, DX 69, a "technical letter" that instructs a contractor to proceed with specified work, Tr. 896:22-24 (Tinari). The contracting officer determined that Catel was responsible for the additional costs that directly resulted from the steel elevation discrepancy. DX 69. Those additional costs included modifications to the roof trusses

11

and correction of the parapet wall shortfall.  Id.  Because truss modification work was already completed, id.; see also DX 512 (indicating that adjustments to the trusses were made by late February 1997), the contracting officer directed Catel to proceed with work necessary to compensate for the parapet wall shortfall, DX 69.  Catel was informed of its right to request a final decision from the contracting officer if it disagreed with the letter of direction.  Id.

### c.  The Navy's May 23, 1997 Letter of Direction

Catel received the contracting officer's April 2, 1997 letter of direction, but it did not commence work on the parapet walls.  Tr. 616:13-16 (Miller).  Instead, Catel submitted another request for an equitable adjustment on May 20, 1997.  See DX 75.  The contracting officer denied Catel's request, explaining that the Navy previously addressed the issue and determined that Catel's request lacked merit.  Id.  The contracting officer noted that Catel was issued a letter of direction on April 2, 1997, and again directed Catel to proceed with the parapet wall work.  Id.

Catel did not proceed with work on the parapet walls following the issuance of the second letter of direction.  Tr. 625:21-25 (Miller).  Instead, Catel, on May 30, 1997, advised the Navy that the contracting officer's letters of direction were "nonapplicable."  DX 77.  Claiming that an "abundance of problems in the project plans [were] insurmountable" and could "not be absorbed in the present project schedule," Catel informed the Navy of its readiness to "pursue and obtain payment for all cost[s] incurred due to design flaws in this project."  Id.

### d.  The Parties Agree to Share Liability for Costs

Several weeks later, Catel accused the Navy of "tabl[ing]" the structural steel elevation and parapet wall liability issues and focusing instead upon "smaller[,] non significant" issues. DX 93.  The parties participated in a meeting on June 18, 1997, id., and ultimately agreed that Catel and the Navy would each accept fifty percent liability for the negotiated cost to correct the steel elevation and parapet wall issues, DX 97.  Catel later claimed that it was "forced to [accept] fifty percent . . . of the liability for the ambiguities in the architectural drawings," asserting that it did "not have a magic wand [to] wave over this project to cure all deficiencies and recover lost time."  DX 104.

The Navy disagreed with Catel's claim that it was forced to accept liability but maintained that Catel was responsible for the discrepancies.  DX 111.  It asserted that Catel failed to verify existing conditions and ensure that its subcontractors' work was performed in accordance with the "entire set of contract drawings."  Id.  The Navy explained that its willingness to accept responsibility for half of the costs merely reflected its desire to "keep this contract moving . . . ."  Id.

12

### e. Catel Continues to Delay Performing Work on the Roof

On July 1, 1997, the Navy issued unilateral Modification P00005, DX 7, which addressed several issues, including a time extension for additional parapet wall work, Tr. 630:6-631:15 (Miller), 805:13-807:22 (Tinari).  Although Catel received two letters of direction from the Navy in April and May 1997, see supra Parts I.D.3.b-c, Catel did not begin work on the parapet walls until mid-July, three weeks after the issuance of Modification P00005, DX 106, 111, 147.

The Navy determined that Catel took no action to procure necessary materials for metal roof panels between April and July 1997.  DX 147.  It also determined that Catel never transmitted necessary submittals for the work.  Id.  As a result, the Navy modified the contract requirement for metal roof panels in order to reduce the period for contract completion by nine weeks.  Id.

Roof installation remained incomplete in mid-August 1997.  DX 115.  Without a complete roof, the building was not water-tight.  See id.  Consequently, interior electrical, ventilation, plumbing, painting, and tiling work could not be completed.  Tr. 626:17-21 (Miller); see also id. at 626:22-627:1 (Miller) (explaining that "very little work," other than "basic rough construction," could be performed without a completed roof), 655:6-13 (Miller) (indicating that interior work could not be completed due to "water damage since we did not have a weather tight seal of the building").  In September 1997, a dispute between Catel and its roofing subcontractor, Allied Contractors, Inc. ("Allied"), prevented completion of the roof and caused further delays.  DX 138; see infra Part I.F.2.a.  The roof remained incomplete in October 1997.  DX 147.

### 4. Numerous Requests for Equitable Adjustments and Contract Extensions

While the parties' resolution of the structural steel elevation and parapet wall issues remained ongoing, additional issues arose.  In March 1997, Catel requested an equitable adjustment for deleted work related to the removal and disposal of two oil tanks.  DX 66.  The Navy, however, disagreed with Catel's position.  DX 68.  Then, during an April 24, 1997 site inspection with a Ewing Cole structural engineer, Catel represented that it negotiated the removal of a steel plate with Lieutenant Wood in order to reduce costs associated with Modification P00004.  DX 71.  The Navy, however, had no record of any negotiation, and Lieutenant Wood, when contacted by the Navy about the purported agreement, indicated that he "knew of no such agreement."  Id.  Catel later clarified that the negotiation never occurred, but it reasserted entitlement to an equitable adjustment.  DX 72.

Subsequently, in May 1997, Catel advised the Navy that unforeseen site conditions, limited funding, and the need to negotiate modifications delayed its ability to perform the contract.  DX 74.  It presented to the Navy a narrative of "accurate facts" on May 30, 1997.  DX 77.  According to Catel, the Navy's method of addressing funding problems was to compel Catel to "pay for design flaws" in the specifications.  Id.  Catel advised the Navy that it would exercise its right to obtain payment for all costs incurred due to these "design flaws."  Id.  Catel also

13

asserted that it "cooperated fully" with the Navy throughout the project and accused the Navy of disrupting its ability to perform.  Id.  In response, the Navy indicated that it paid to Catel all additional costs arising from change orders that it believed were due.  DX 80.  It also maintained that any plan and specification problems were "no more than normally encountered" in a contract of similar scope.  Id.

Also in May 1997, Catel requested equitable adjustments for concrete work, insulation, and closet construction.  DX 82-83.  These costs stemmed, in part, from Catel's demolition of an existing wall that Catel unilaterally determined was not structurally sound.  Id.  Catel also requested a contract extension of thirty days.  See DX 82.  Ensign Miller denied the request for an equitable adjustment related to the concrete work, explaining that Ewing Cole never directed Catel to pour additional concrete.  Id.; see also DX 85 (indicating that Catel was not authorized to install additional concrete).  Although Ensign Miller determined that Catel was owed an equitable adjustment for the installation of additional insulation, DX 82, he denied Catel's request for an equitable adjustment for work required to replace the demolished wall because (1) Catel failed to submit documentation demonstrating that the wall lacked structural integrity, (2) the Navy never authorized Catel to proceed with the demolition, and (3) Catel's delayed submission of its request for equitable adjustment violated the contract's changes clause, DX 83.  Ensign Miller also denied Catel's request for an extension of the contract completion date, concluding that no delay resulted from any of the work Catel performed.  DX 82.

Numerous letters to Catel throughout June 1997 detailed various issues arising from Catel's performance and its subcontractors' performance.  See DX 84-86, 88-91, 95-96, 101.  On June 17, 1997, Catel, citing time lost from the "discovery of problem after problem with the plans and specifications" and design flaws that it believed made it impossible to maintain the critical path of construction, requested a contract extension of 150 days.  DX 99.  Ensign Miller, denying Catel's request as unreasonable, explained that "Catel need[ed] to provide documentation substantiating [its] claim for 150 day extension by providing an updated progress schedule[] and information on what delays have had an impact on [its] critical path for this project."  DX 102.

### 5. Issues Related to Catel's Quality Control Program

On three separate occasions during 1996, Catel advised the Navy of personnel changes within its quality control program.  See DX 29, 35, 50.  Lieutenant Wood, in a December 31, 1996 letter, expressed concern over Catel's "excessive turnover" and explained that frequent personnel changes rendered it "extremely difficult to maintain control and continuity . . . ."  DX 51.  He also observed that Catel's alternate quality control manager/superintendent was substituting for Mr. Golaszewski "on a regular basis" and reminded Catel that only limited substitutions were permitted under the contract.  Id.

The Navy's concerns with Catel's quality control program continued throughout contract performance.  On June 5, 1997, Ensign Miller notified Catel that it exceeded the number of hours

14

its alternate quality control manager/superintendent could substitute for Mr. Golaszewski.  DX 81.  Catel's failure to ensure that Mr. Golaszewski was present on the job site, Ensign Miller cautioned, would result in the issuance of a noncompliance notice and stop work order.  Id.  On June 9, 1997, Ensign Miller acknowledged additional changes to Catel's quality control personnel and requested that Catel update its quality control plan and provide documentation demonstrating its personnel's qualifications.  DX 84.

One day later, the Navy notified Catel of safety violations on the job site and informed Catel that its quality control manager/superintendent was responsible for ensuring compliance.  DX 86.  Ensign Miller reminded Mr. Parisik of his responsibilities within Catel's quality control program and informed Catel that a noncompliance notice would be issued if Catel failed to timely submit its daily reports.  Id.  Mr. Parisik was absent from the job site on June 17, 1997, and the Navy issued a noncompliance notice.  DX 92, 96.  The Navy later issued a noncompliance notice to Catel for untimely submission of daily reports.  DX 166.

In September 1997, Mr. Tinari requested additional information about Joseph Matusewski, another alternate quality control manager/superintendent.  DX 134.  Although Mr. Matusewski, "appear[ed] to meet the requirements" for the position, Mr. Tinari sought documentation of Mr. Matusewski's employment history to confirm that he possessed the requisite experience.  Id.  Mr. Tinari also advised Catel that Mr. Golaszewski's presence was required at the job site until the Navy could approve Mr. Matusewski.  Id.  Later, the Navy noted that Mr. Matusewski failed to sign several daily reports during the period spanning September 30, 1997, through October 3, 1997.  DX 166.

By October 1997, Catel had replaced its alternate quality control manager/superintendent six times.  DX 147.  Catel hired a seventh alternate quality control manager/superintendent, Maurice J. Dattoli, Jr., in November 1997.  DX 216.  Mr. Dattoli served in this capacity for only six days during the month of November.  Id.  In December 1997, the Navy again issued a stop work order because Mr. Golaszewski was absent from the job site.  DX 226.

In January 1998, NAVFAC questioned Catel's quality control program and emphasized that it was "imperative that continuity of a [quality control] organization be establish[ed]" by Catel in order to ensure contract completion.  DX 235.  NAVFAC also stated that it was "not unreasonable to protect the interest of the government and the bonding company by requiring that work be performed within the frame work [sic] of the approved [quality control] plan."  Id.  On January 23, 1998, Ensign Miller issued another noncompliance notice to Catel after he observed a subcontractor performing work on the job site in Mr. Golaszewski's absence.  DX 254.  Although Mr. Golaszewski reportedly instructed the subcontractor to leave the job site due to his absence, the subcontractor remained on the job site unsupervised for an additional five hours.  Id.  Catel was reminded that it was responsible for its subcontractors "at all times . . . ."  Id.

By January 1998, Catel had eight alternate quality control managers/superintendents working at various times on the project.  DX 256.  Ensign Miller informed NAVFAC that Catel

"abuse[d]" the contract provision authorizing alternative quality control managers/ superintendents to substitute for Mr. Golaszweski and used all allowable time authorized for substitutions.  Id.  The Navy later summarized Catel's quality control deficiencies in a performance evaluation:

> The Alternate [quality control ("QC")] managers . . . also stood in for the QC Manager on a regular basis, in violation of [the contract] . . . .

> For each QC change, the contractor routinely provided either a QC Manager without the necessary experience, without the required QC documentation such as the appointment letter and updated QC Plan, or without the required detail to prove experience on the submitted resume.  These QC changes occurred with no notice to the Government and then little time for the Government to approve the new QC Manager.

DX 382.

### 6.  Modification P00005 and Catel's Letter Correspondence No. 90

As noted in Part I.D.3.e, supra, the Navy issued unilateral Modification P00005 on July 1, 1997.  Modification P00005 added and deleted numerous tasks from the contract, increased the total contract price by $18,678, and extended contract completion by forty-four days to September 15, 1997.  DX 7, 66, 68, 70, 79.  Catel submitted a progress schedule to the Navy on July 3, 1997.  DX 147.  The Navy disapproved Catel's project schedule because it showed contract completion beyond September 15, 1997.  Id.

Catel was not required to sign unilateral Modification P00005.  DX 7.  Nevertheless, Mr. Pires, on July 22, 1997, signed the modification and added an asterisk next to his signature.  Id.  He then inserted the following typewritten text: "* Catel, Inc. disagrees with time extension allowance.  See attached Letter Correspondence No. 90."  Id.

In Letter Correspondence No. 90, which Catel submitted to the Navy on July 7, 1997, Catel claimed that the additional forty-four-day contract extension set forth in Modification P00005 was insufficient.  DX 104.  Catel claimed that "unforeseen deficiencies/poor design" caused delays, and Catel was unable to retain subcontractors as a result.  Id.  Catel protested what it believed was the Navy's refusal to account for time needed for "material manufacturing and re-ordering" and subcontractor coordination.  Id.  It believed that the additional forty-four days for contract performance were "unrealistic" and placed upon it "unjustifiable additional stress/ pressure."  Id.  Claiming that contract completion by September 15, 1997, was "impossible," Catel requested an extension of time until November 15, 1997.  Id.  Any date prior to November 15, 1997, Catel explained, was "not . . . practical[,] possible, []or feasible . . . ."  Id.  It then advised the Navy that it intended to seek an equitable adjustment.  Id.

16

Ensign Miller addressed Letter Correspondence No. 90 on July 14, 1997. DX 106. He disputed all of Catel's assertions and explained that

> [a]ny problems with subcontractors [were] Catel's responsibility, and I disagree with your statement that these problems [were] due to the "lengthy delays (experienced in this contract)." The September 15, 1997 contract completion date [was] what was deemed reasonable to complete the amount of work remaining in this contract. The Government gave your firm all necessary direction concerning the parap[et] wall elevation issue on April 2, 1997, but this direction was not acted upon by your firm. As of July 11, 1997, the work involved in correcting the parap[et] wall elevation discrepancy had not been started by Catel, Inc. This [was] three months after the original Government letter of direction, and now about three weeks after receipt of the unilateral Modification P0005. This [was] the cause of the lengthy delays as mentioned in your [c]orrespondence . . . .

Id. Two weeks later, Ensign Miller reiterated the Navy's position: "If Catel had followed the initial Letter of Direction, then there would have been no need to reschedule subcontractors[] based on [Catel's] updated April progress schedule." DX 111.

### 7. The Navy's Letter of Forbearance

Problems with Catel's contract performance continued after the Navy issued unilateral Modification P00005. See DX 108-10, 396. The Navy requested that Catel submit an updated progress schedule showing Catel's proposed completion date of November 15, 1997. DX 147. Catel submitted the progress schedule on August 7, 1997. DX 112.

The Navy reviewed Catel's progress schedule and, on August 8, 1997, informed Catel that it had no confidence that Catel would complete construction by September 15, 1997. Id. Despite reaching this conclusion, the Navy elected to forbear terminating the contract for default. Id. This decision, the Navy explained, was based upon Catel's construction schedule, which projected contract completion by November 15, 1997. Id.

The Navy approved the August 7, 1997 construction schedule "solely for the purpose of mitigating the damage [Catel] would incur if the contract were terminated for default." Id. It made it clear that this approval did not waive the Navy's right to assess liquidated damages. Id. Thus, Catel was advised that the Navy's decision to forbear "should not be construed as waiving any right the Government may have under the referenced contract[,] including the right to assess liquidated damages ($250/day) or terminate for default at a later date." Id.; see also DX 12 (containing the liquidated damages clause set forth in FAR 52.212-5). The Navy informed Catel that it would assess liquidated damages beginning on September 15, 1997, and for each day thereafter until contract performance was complete. DX 112. The Navy also indicated that Catel's "lack of timely performance on this contract [would] be reflected in [its] contractor performance evaluation." Id.

17

Catel responded to the Navy's letter of forbearance, characterized the time extension set forth in Modification P00005 as "disputed," and explained that its acceptance of Modification P00005 "was conditional as to allow payment for extra work." DX 113. Catel noted prior requests to extend contract performance "due to subcontractors and suppliers having to reschedule and remobilize after the lengthy delays from contract modifications and changes . . . ." Id. It advised the Navy that it would accelerate performance and these efforts would "undoubtedly result in constructive acceleration claims against the Navy." Id. Catel again requested additional time, to November 15, 1997, to complete construction, citing delays and changes that "almost doubled the contract completion time originally specified" and "significantly altered the original scope and intent of the project." Id.

Ensign Miller reaffirmed that the contract completion date remained September 15, 1997, explaining that the Navy did "not foresee any reason" justifying Catel's request for additional time. DX 114. He also explained that there were "no changes which have changed the scope or intent of this project . . . ." Id. Ensign Miller reminded Catel that Modification P00005 extended the contract an additional forty-four days even though "only 14 days of critical path work were added to the contract." DX 118. Thus, the Navy noted, Modification P00005 "allowed over two and [one-] half months [for Catel] to complete the remaining work in the contract, which was originally only an eight month contract." Id.

### 8. Catel's Construction Deficiencies

In a September 4, 1997 memorandum, Ensign Miller documented the substance of a conversation he had with Mr. Parisik. DX 120. Ensign Miller recounted that Mr. Parisik "was willing to point out" Catel's "deficiencies," which included, among other things, an improperly installed floor expansion joint, a discolored window frame, malfunctioning interior doors, and the use of "scrap" wood in place of plywood sheathing. Id. Mr. Parisik also "said that there were other problems that he would point out at a later date." Id.

### a. Wrong Interior Paint

The Navy discovered numerous construction deficiencies in addition to those identified by Mr. Parisik. See DX 123, 125, 127-30, 136-37, 426. For example, Catel failed to use the correct interior wall paint color set forth in the contract. Tr. 656:20-25 (Miller). Catel claimed that Ensign Miller "didn't like" the color and issued a unilateral change. DX 169. The MWRD agreed to accept the incorrect wall paint color but requested modifications to the interior door frame paint colors. Tr. 657:1-3, 14-18 (Miller). Ensign Miller discussed this proposed modification with Mr. Golaszewski, who furnished color samples to the Navy. Id. at 657:19-23 (Miller); DX 145.

On October 6, 1997, the Navy advised Catel that the MWRD selected a paint color for the interior doors, doors and frames, staircase railings, and other trim. DX 144. Catel's painting subcontractor, however, already began work using the original paint color. DX 145; see also DX

18

146 (rejecting Catel's contention that Ensign Miller verbally authorized Catel to proceed with painting). Catel's painting subcontractor then "made the decision that it was no longer worth his time to continue painting[] if he did not have the approved color." DX 146.

Catel, the Navy explained, "proceeded at its own risk" and would be required to repaint the interior doors and frames because it performed work without government approval. DX 145; see also DX 146 (advising Catel that it failed to wait for government approval, which occurred within one working day, and "proceeded at its own risk"). Catel accused Ensign Miller of preventing it from performing work, a claim that Ensign Miller disputed in its entirety. See DX 146. The MWRD ultimately declined to accept the incorrect trim paint color, and Catel was again advised that it needed to repaint the interior doors, frames, and trim using the approved color. DX 148.

### b. Exterior Steel Doors

In October 1997, Ensign Miller apprised Catel that it failed to install exterior steel doors with a factory-applied organic coating. DX 162. Consequently, the doors Catel installed did not comply with the contract specifications. Id. Nevertheless, the Navy agreed to accept the noncompliant doors in exchange for Catel's agreement to reinstall plywood in two locations and to make several minor corrections to other work it performed. Id.

### c. Sprinkler System

Also in October 1997, the Navy informed Catel that it "continue[d] to proceed at its own risk [with] the installation of the sprinkler system, since the Government ha[d] not approved any of the necessary submittals for this system." DX 164. Ten of Catel's submittals had not been approved by the Navy. Id. Moreover, the Navy expressed concern that a final inspection of the sprinkler system could not be scheduled until all submittals were reviewed and approved. Id. The failure to conduct an inspection further delayed contract completion. Id.

### d. Noncompliant Roofing

In November 1997, the Navy notified Catel that its roof installation did not conform to the contract specifications. DX 194. The Navy noted that Catel failed to remove existing metal flashing and that the specifications required a formed aluminum coping cap on the parapet wall. Id. Catel also failed to conduct a preroofing conference. Id. As a result, it performed work without the approval of necessary submittals. Id. The Navy indicated that a meeting with the roofing manufacturer's representative was necessary to "ensure that the manufacturer will warrant the work in place[] and to discuss how to correct the non-conforming work items . . . ." Id.

### 9.  The Navy's Interim Evaluation of Catel's Contract Performance

Mr. Tinari submitted to NAVFAC a recommendation of interim unsatisfactory evaluation of Catel's contract performance in October 1997.  DX 147.  His evaluation of Catel's contract performance was divided into five categories: (1) Quality Control, which contained eleven subcategories; (2) Effectiveness of Management, which contained nine subcategories; (3) Timely Performance, which contained seven subcategories; (4) Compliance with Labor Standards, which contained three subcategories; and (5) Compliance with Safety Standards, which contained three subcategories.  Id.

### a.  Quality Control

The Navy rated Catel's performance as "unsatisfactory" in three Quality Control subcategories: Implementation of a Quality Control Plan, Quality of the Quality Control Documentation, and Adequacy of Submittals.  Id.  It rated Catel's performance as "marginal" in the Quality of Workmanship, Use of Specified Materials, and Identification/Correction of Deficient Work in a Timely Manner subcategories.  Id.  Catel's performance was "satisfactory" in three subcategories: Adequacy of the Quality Control Plan, Storage of Materials, and Adequacy of Materials.  Id.  Finally, the Navy rated as "not applicable" Catel's performance in the subcategories of Quality Control Testing Adequacy and Adequacy of As-Builts.  Id.  The Navy justified each "unsatisfactory" rating it assigned to Catel in narrative form.  Id.

### b.  Effectiveness of Management

The Navy rated Catel's performance as "unsatisfactory" in two Effectiveness of Management subcategories: Management of Resources/Personnel, and Effectiveness of Job Site Supervision.  Id.  It rated Catel's performance as "marginal" in the Cooperation and Responsiveness, Coordination and Control of Subcontractor(s), Adequacy of Site Clean-Up, Professional Conduct, and Review/Resolution of Subcontractor's Issues subcategories.  Id.  Finally, the Navy rated as "not applicable" Catel's performance in the subcategories of Compliance with Laws and Regulations, and Implementation of Subcontracting Plan.  Id.

### c.  Timely Performance

The Navy rated Catel's performance as "unsatisfactory" in four Timely Performance subcategories: Adherence to Approved Schedule, Resolution of Delays, Submission of Required Documentation, and Submission of Updated and Revised Progress Schedules.  Id.  It rated Catel's performance as "satisfactory" in one subcategory, Adequacy of Initial Progress Schedule.  Id.  Finally, the Navy rated as "not applicable" Catel's performance in the subcategories of Completion of Punch List Items and Warranty Response.  Id.

### d.  Compliance With Labor Standards and Safety Standards

The Navy rated Catel's performance as "marginal" in all three Compliance with Labor Standards subcategories: correction of noted deficiencies, payrolls properly completed and submitted, and compliance with labor laws and regulations.  Id.  It rated Catel's performance as "satisfactory" in all three Compliance with Safety Standards subcategories: adequacy of safety plan, implementation of safety plan, and correction of noted deficiencies.  Id.

### 10.  Catel Continues to Attribute Delays to the Navy

On August 20, 1997, the Navy advised Catel that no workers were present on the job site for two consecutive days.  DX 115.  It explained:

> Although the Government . . . forb[ore] terminating this contract until Catel's revised completion date of 15 November 1997, the stipulation to that forbearance [was] the jobsite [sic] must be manned at all times with full crews.  This information was stressed to Mr. Golaszewski, and he was told that upon completion of the roof, the Government want[ed] to see full construction crews on site to finish the interior of the building, which include[d] electrical, HVAC, plumbing, painting, tiling, etc.

Id.  Catel attributed the absence of workers to inclement weather during the two days in question. DX 116.  It then accused the Navy of controlling the work, progress, time, and costs of the project, stating:

> [T]he Navy bypassed our chain of command[] and directed field crews to perform changes (i.e., add an opening beneath the stairs, framing changes and plywood changes).  It [was] apparent that a representative of the Contracting Officer [took] some project control from the contractor as to bypass/expedite the modification and change order process.  The administration of the contract has not been in accordance with the formal requirements established by the federal government.

Id.  Catel indicated that the Navy's refusal to extend the contract completion date "forced" it to "accelerate efforts and progress in an attempt to complete on time" and "avoid legal entanglements and damages."  Id.  It also asserted that the Navy's scrutiny of Catel's management of the project stemmed from the Navy's "attempt[] to make up for lost time resulting from delays, deficiencies and defects with the project's design, documents, and lack of project funding . . . ."  Id.; see also DX 147 (noting Catel's numerous efforts to "portray the position that, because of the contract changes, it has suffered numerous delays in the performance of its contractual obligations since the beginning of the project").

Catel then informed the Navy that it incurred additional costs "due to structural ambiguities" in the plans.  DX 117.  Citing "unforeseen material cost[s] along with more than

21

double the projected labor cost[s]," Catel explained that it reserved the right to seek an equitable adjustment for the cost difference between its original and new roofing subcontractors.  Id.  Catel also responded to the Navy's request for a credit by indicating that "no credit" would be issued. Id.

Although Ensign Miller ultimately acknowledged that inclement weather may have impacted Catel's ability to complete work for two days, he rejected Catel's other excuses, stating they had no effect upon the project.  DX 118.  He reiterated that Catel was required to furnish workers on the job site at all times and that the Navy expected Catel to provide "full construction crews on site to finish the interior of the building . . . ."  DX 115.  Since June 1997, the Navy observed, Catel staffed "an average construction crew on site of about one superintendent and three workers . . . ."  DX 147; see also DX 165 (noting that Catel requested and received permission for fifteen individuals to work after hours on a Saturday but only one individual reported to the job site).

Ensign Miller explained that the Navy's decision to forbear termination of the contract for default and assess liquidated damages did not constitute an attempt to control Catel's work.  DX 118.  The Navy, Ensign Miller indicated, provided direction to Catel with respect to the steel elevation and parapet wall issues and took "no action to remove 'project control from the contractor so as to bypass/expedite the modification and change order process.'"  Id.  Catel's failure to participate in a required preroofing conference meant that Catel "proceed[ed] at its own risk by installing [a] roofing system without the required Government approval."  Id.

The Navy again informed Catel that it was due a credit.  DX 119.  Furthermore, Ensign Miller disputed Catel's position that the Navy was liable for Catel's costs to obtain new roofing subcontractors: "As stated in the Government's correspondence . . . , if Catel had followed the Contracting Officer's Letter of Direction of 2 April 1997, there would have been no need to change roofing subcontractors.  However, since Catel ignored this direction, any additional costs incurred [were] Catel's responsibility."  Id.  Nevertheless, Ensign Miller expressed a willingness to analyze Catel's costs once Catel submitted a request for an equitable adjustment.  Id.

On September 30, 1997, the Navy notified Catel that it was behind schedule.  DX 147. The Navy observed that, since the issuance of Modification P00005 and its letter of forbearance, Catel "made no efforts to increase its work force on the site to complete [the] project as close to the 15 September 1997 contract completion date as possible."  Id.  The Navy also expressed concern that Catel, which was behind schedule on roof paneling, carpentry, rough electric work, wiring, and drop ceiling installation, could not complete construction by November 15, 1997. DX 139.  Ensign Miller requested that Catel identify what steps it would take to ensure contract completion by November 15, 1997, emphasizing that

the Government . . . decided to forbear termination of this contract until 15 November 1997.  If Catel, Inc. has not completed its contractual obligations by that date, the Government may initiate actions to terminate this contract for

default by the contractor.  The Government is also continuing to assess liquidated
damages[] at the rate of $250.00/day, in accordance with [the contract], as of the
contract completion date of 15 September 1997.

Id.

### a.  Catel's Counsel's October 3, 1997 Letter to the Navy

On October 3, 1997, Mr. Lawless submitted a letter to Mr. Tinari.  DX 141.  According to
Catel, the Fleet Recreation Center project involved twenty-four executed modifications to the
contract and five major structural changes.  Id.  These changes, Mr. Lawless argued, were
necessary "because the Navy's plans and specifications were woefully inadequate."  Id.  Mr.
Lawless indicated that Catel was entitled to an extension of time, through December 31, 1997, to
complete contract performance and emphasized that the Navy "continuously interfered with
Catel's work."  Id.  Mr. Lawless also expressed Catel's belief that it was "entitled" to an
indefinite extension of time to complete the contract.  Id.

Mr. Lawless attributed Catel's performance delays "solely [to] a gross breach of security
by the Navy and Ensign[] Miller's unwarranted meddling" into Catel's contractual relationship
with Allied, its roofing subcontractor.  Id.  According to Mr. Lawless, Ensign Miller breached his
obligations under the contract and unilaterally set September 15, 1997, as the contract completion
date without explanation or justification.  Id.  Mr. Lawless also claimed that a security breach,
which purportedly permitted Allied to gain unauthorized entry onto the job site, "played a major
role in the current status of the roofing work and further delays."  Id.  Furthermore, Mr. Lawless
objected to the Navy's "threatened assessment" of liquidated damages.  Id.

### b.  The Navy's Response to Catel's Counsel

Mr. Tinari responded to Mr. Lawless's letter on October 10, 1997.  DX 157.  He observed
that Catel failed to comply with the Navy's request that Catel identify the actions it was taking to
complete the contract by the forbearance date of November 15, 1997.  Id.  Mr. Tinari reiterated
the Navy's request for this information.  Id.

Mr. Tinari also noted that Catel failed to substantiate its request for a 150-day extension
of time, explaining that Modification P00005 set forth the justification for the Navy's September
15, 1997 deadline.  Id.  Addressing Catel's accusation that the Navy interfered with its contract
performance, Mr. Tinari stated:

The Government has the authority to have the contractor correct non-conforming
or deficient work when it is noted. . . .  I must also disagree with your statement
that "this current dilemma results solely from a gross breach of security by the
Navy."  Catel [was] still responsible for its subcontractors, and Catel was way
behind schedule before this incident with [Allied].

Id.  Mr. Tinari identified several contract items that could be completed while the roofing issue with Allied remained unresolved, observing that "a significant amount" of work remained incomplete.  Id.

Finally, Mr. Tinari rejected the assertion that Catel was entitled to additional time to complete the contract and explained that Catel did not justify a need for additional time.  Id. Moreover, the Navy was unable to negotiate additional contract extensions.  Id.  The Navy again repeated its concern that Catel would fail to complete construction by November 15, 1997.  Id.

### c.  Catel's October 22, 1997 Request for an Extension of Time

Catel responded to Mr. Tinari's letter on October 22, 1997, addressing its response to NAVFAC.  DX 169.  Catel set forth its belief that the Navy "penaliz[ed]" it for "trying to over come [sic] the gross amount of deficiencies and ambiguities in the contract plans and specifications, accompanied by the discovered unforeseen field conditions which were encountered during early phases of construction."  Id.  Catel explained that it was "difficult to explain what the domino effect [was] on a project when interrupted by major project redesigns" and reiterated that it had to address deficiencies and ambiguities in the Navy's specifications "on a daily basis."  Id.; see also id. (stating that the project had "many problems" that were not Catel's fault).  Catel enumerated several instances in which it believed Ensign Miller "interfered" with its ability to perform, accused Ensign Miller of harassing Catel and "attemp[ing] to put Catel Inc. out of business," and attributed performance delays to the Navy.  Id.; see also id. (accusing Ensign Miller of "continuous meddling"); Tr. 653:24-654:2 (Miller) (noting that Catel filed a formal complaint against Ensign Miller for "meddling in [its] subcontractor affairs").

Catel expressed its desire "to just finish the project and move on to our other projects" and emphasized that it "cooperated with the U.S. Navy when ever [sic] asked to . . . ."  Id. Contending that the November 15, 1997 contract completion date was "no longer applicable," Catel stated it needed additional time to complete the project.  Id.  It proposed a completion date of May 15, 1998.  Id.

### 11.  The Navy Recommends Termination of the Contract for Default

NAVFAC's response to Catel's October 22, 1997 letter was prepared by Mr. Tinari.  DX 177; see also DX 185 (containing a similar memorandum from Mr. Tinari addressed to NAVFAC).  NAVFAC disagreed with Catel's various allegations and contentions and determined that Catel's request for a time extension was "without merit."  DX 177.  The date for contract completion, Catel was advised, remained September 15, 1997, with a forbearance date of November 15, 1997.  Id.  Catel was informed that it would remain liable for liquidated damages at a rate of $250 per day until contract completion.  Id.

On October 31, 1997, the contracting officer notified Catel that it did "not demonstrate to [the Navy's] satisfaction . . . any basis for delay which would adequately excuse [Catel's]

untimely performance of this project." DX 182.  Consequently, the contracting officer recommended that NAVFAC terminate Catel's contract for default.  Id.  Catel was afforded an opportunity to meet with the Navy to explain why the contract should not be terminated for default before NAVFAC made a final termination decision.  Id.; see also DX 252 (indicating that the meeting occurred on November 17, 1997); infra Part I.D.12.  Catel was advised that it should attend the meeting together with an authorized representative from Ranger because the Navy would expect Ranger to complete the contract.  DX 182.

The Navy also separately advised Ranger that Catel's proposed completion date of May 15, 1998, was "unacceptable," Catel had not established a basis for excusable delay that would justify a time extension, and Catel was in default of its contractual obligation to timely complete the project.  DX 183.  Ranger, the Navy explained, would bear responsibility for contract completion and any additional costs associated with reprocurement.  Id.  Ranger would also be responsible for the payment of liquidated damages.  Id.; see also DX 305 (containing copies of the performance and payment bonds entered into by Catel and Ranger in 1996).  In the event of a termination of the contract for default, Ranger was expected to complete the contract as the prime contractor in accordance with the terms of a standard takeover agreement executed between Ranger and the Navy.  DX 183.  Although Ranger could subcontract out all or a portion of the actual work, the Navy advised Ranger that it would remain responsible for contract administration and completion.  Id.  Thereafter, the Navy forwarded to Ranger a list of subcontractors seeking payment from Catel for work performed.  Id.

The ROICC office recommended that NAVFAC terminate Catel's contract for default. DX 185; see also Tr. 639:4-9 (Miller) (explaining that only NAVFAC had authority to terminate the contract).  The ROICC office prepared three documents for NAVFAC's use to reach its determination.  DX 198-200.  The first document summarized Catel's contract performance and indicated that Catel staffed the project with few workers throughout construction.  DX 198.  The second document detailed Catel's "excessively high turnover rate" of superintendents and subcontractors.  DX 199.  The third document set forth the circumstances that led to the Navy's issuance of unilateral Modification P00005.  DX 200; see supra Part I.D.6.  On November 14, 1997, Ensign Miller provided to NAVFAC the narrative explaining Catel's interim "unsatisfactory" performance evaluation ratings.  DX 202; see supra Part I.D.9.

## 12.  The Navy Forbears Terminating the Contract for Default

A meeting between the Navy and Strategic Operational Services ("SOS"), Ranger's agent, occurred at NAVFAC on November 17, 1997.  DX 207.  During the meeting, the parties agreed that the Navy would temporarily forbear terminating the contract for default on the condition that Ranger actively participate in the project's completion.  DX 214, 252.  Ranger agreed to provide a construction management company to assist Catel with contract completion, Tr. 639:16-19 (Miller), and assumed responsibility for managing payments, DX 252.  In December 1997, the Navy, Catel, and Ranger executed Modification A00007, which changed the contract payee from Catel to Ranger.  DX 9.  Catel remained the contractor of record.  DX 214.

### 13.  Ranger Begins Managing the Project

The Navy, on November 18, 1997, provided to Ranger, through SOS, an updated list of submittals that required the Navy's approval.  DX 207.  The list included 144 submittals pertaining to a variety of tasks such as finish carpentry, roof and exterior insulation, metal roofing, sealants, sprinkler and plumbing systems, duct work, interior wiring, lighting, and fire alarm and detection systems.  Id.  The Navy also furnished copies of Catel's processed and paid invoices.  DX 208.

Ranger hired Cashin to monitor completion of the project and assist Catel.  DX 214.  In a December 1, 1997 letter to the Navy, Cashin represented that it would analyze the status of Catel's submittals and provide a schedule for submission of outstanding submittals and resubmittals to the Navy.  Id.  It stated that it would help Catel prepare a realistic project completion schedule and monitor construction progress, quality control, scheduling, and submittals.  Id.  Cashin clarified that its role was to "monitor, consult and assist with project completion," not manage the contract.  Id.  Cashin requested that it be furnished copies of all correspondence between Catel and the Navy.  Id.

In order to provide Cashin with a status of the Fleet Recreation Center project, Tr. 640:15-19 (Miller), the Navy invited Ewing Cole, which played a significant role in advising the Navy with respect to various elements of Catel's contract performance, see DX 126-27, 129-30, 133, 140, 215, 223-24, 227, 229, 255, 265, 272, 276, 280, 297, 300, 324, 397-400, 404-05, 410, to visit the project site and develop a list of work that would enable Cashin and Catel to formulate a work schedule, Tr. 640:20-641:3 (Miller).  Ewing Cole toured the project on December 2, 1997, and generated a report one week later.  DX 217, 220.  The report detailed numerous items that required additional work.  DX 217.

Catel provided to Cashin a list of subcontractors it hired to complete the work set forth in Ewing Cole's site visit report.  DX 237.  Thereafter, Cashin proposed a project completion date of April 20, 1998.  DX 220, 232.  The Navy, however, believed that Cashin's proposed schedule needed revision based upon Ewing Cole's report, which identified "some items indicated as complete [that were] not complete due to rework . . . ."  DX 217, 220.

### 14.  Catel Attributes Delays to the Navy and to Cashin

In January 1998, Catel accused the Navy of providing direction on work that was "non applicable" and contrary to contract specifications.  DX 244.  These directions, Catel claimed, "directly caus[ed] serious delay to the project," and Catel questioned how the Navy could properly attribute blame to Catel's quality control program for various discrepancies.  Id.  Catel again cited "ambiguities existing in the specifications" as the reason for delays to the critical path of contract completion.  Id.  It requested additional time for contract completion and an equitable adjustment.  Id.

26

Then, in a January 14, 1998 letter from Mr. Lawless to NAVFAC, Catel claimed that the Navy inhibited its ability to perform work as a result of newly implemented security procedures at the Earle Naval Weapons Station.  DX 251.  According to Catel, it "was now required to first bring all of its subcontractors and employees to the ROICC office for its approval. . . .  [T]his is an unnecessary requirement which serves no purpose other than to further . . . efforts to interfere with Catel's performance."  Id.  Catel also accused NAVFAC of "chang[ing] the procedures for gaining admittance to the job site," stating that the Navy's protocol created unnecessary delays and caused Catel to incur additional costs.  Id.

Ranger hired Tom Robey to serve as the project manager and monitor the project on site. DX 266.  Mr. Robey was also responsible for resolving payment complaints between Catel and its subcontractors and suppliers.  Id.  Mr. Robey advised the Navy that he required Mr. Golaszewski's assistance "now and again . . . ."  DX 268.

On March 4, 1998, Mr. Robey arranged to meet Mr. Golaszewski at the job site to take soffit measurements.  DX 271.  However, a security incident involving Mr. Golaszewski prevented Mr. Robey from completing the measurements.  DX 267-69.  The Navy did not extend Mr. Golaszewski's permanent pier pass but intended to issue a daily pier pass for Mr. Golaszewski's use.  DX 269, 301.  Mr. Golaszewski gained unauthorized access to the pier by using an expired pass.  Id.  Security escorted Mr. Golaszewski to obtain his daily pier pass, DX 301, but Mr. Golaszewski became agitated and engaged in "highly unprofessional" conduct, DX 267-68.  He ultimately "chose to leave the base rather than wait in line."  DX 301; cf. DX 365 (indicating that, as of September 17, 1998, Catel continued to claim that the Navy denied its personnel access to the job site).

Catel claimed that the incident with Mr. Golaszewski was "costly," DX 268, because Mr. Robey could not take soffit measurements without Mr. Golaszewski's assistance, DX 270-71. On March 9, 1998, it advised NAVFAC that the Navy sought to "completely deny" Mr. Golaszewski "any access" to the project.  DX 271.  According to Catel, the security incident caused it to miss a fabrication cycle, thereby delaying its ability to perform work by an additional three weeks.  Id.  Catel noted: "If the Navy wants this job completed as quickly as possible, it should step in and handle its personnel in an appropriate manner.  If it doesn't then the personnel should be permitted to continue as has been allowed thus far."  Id.; see also DX 325 (accusing the Navy of inhibiting Catel's performance and delaying construction).

Catel also attributed performance delays to Cashin, which Catel claimed did not return telephone calls.  DX 253.  According to Catel, a representative from Cashin failed to meet with Mr. Golaszweski on three separate occasions, and Cashin failed to submit a project schedule.  Id. Catel claimed that its inability perform the contract resulted from Cashin['s] . . . involvement in this project. . . .  [Its] involvement [was] not helping this project."  Id.

27

### 15.  The Navy Again Forbears Terminating the Contract for Default

The Navy observed that Catel's "poor performance" continued "despite the efforts of the construction management firm." DX 232.  The ROICC office recommended that NAVFAC instruct Cashin to "take a more active role in managing [the] contract, as compared to purely consulting." Id.  The Navy again considered terminating the contract for default. Id.

Catel submitted a project schedule indicating a contract completion date of May 30, 1998. DX 262, 428.  The contracting officer advised Catel that the Navy "remain[ed] concerned about the progress of this project . . . ." DX 262.  Nevertheless, the Navy once again agreed to forbear termination for default subject to Catel "working diligently . . . to orchestrate the completion of the project." Id.  The Navy reserved its right to terminate the contract if Catel failed to diligently perform and noted that approval of Catel's project schedule did not waive the Navy's assessment of liquidated damages "from the contract completion date of September 15, 1997[,] until completion of the work and acceptance by the Government." Id.

Catel did not complete contract performance by May 30, 1998. DX 306.  Nevertheless, the Navy, on June 4, 1998, continued to forbear termination of the contract for default based upon Catel's "expressed intent to complete the contract work." Id.  The Navy set June 12, 1998, as a deadline for Catel to submit a revised project completion schedule. Id.  It continued to reserve the right to assess liquidated damages "from 15 September 1997 to the date of completion of the work . . . ." Id.

### 16.  Modification P00008

On June 11, 1998, the Navy issued unilateral Modification P00008, which deleted several work items and added two additional work items: application of an epoxy grout to cover an electrical conduit and installation of a fire-rated access door for a fan coil unit. DX 10, 309. Modification P00008 reduced the total contract price by $1,804 and extended the contract completion date to September 20, 1997. Id.  Catel, which was not required to sign Modification P00008, id., raised objections with the Navy shortly after receipt of the modification, DX 318.

### 17.  Disputes Continue and the Navy Discovers Additional Deficiencies

In April 1998, Catel expressed concern about "existing field conditions" that it asserted created an "impossibility of performance." DX 292.  Accusing the Navy of "non-cooperation," Catel attributed additional delays to the Navy. Id.  Catel's complaints continued into June 1998. See DX 311 (claiming that the Navy's failure to resolve several outstanding issues "interrupted [Catel's] critical path to completion").

On April 28, 1998, the Navy advised Catel that it was withholding payment of $2,000 until Catel corrected a discrepancy related to the installation of and finishing on exterior doors. DX 294; see also DX 346 (indicating that Catel had not corrected the discrepancy as of July 17,

1998).  In May 1998, Mr. Tinari identified sixteen issues that required Catel's attention.  DX 297.
Ewing Cole conducted a site visit in late May 1998 and submitted an eighteen-page report
documenting deficiencies and unfinished work.  DX 303.  The Navy provided a copy of Ewing
Cole's report to Catel and emphasized that Catel was "still responsible for the quality control of
the project and formulating its own rework lists . . . ."  DX 310.

Catel claimed that the Navy precluded it from assembling and submitting an accurate
project schedule.  DX 311; see also DX 312, 315 (claiming that directions given by the Navy in
Modification P00008 were impossible to perform and seeking additional direction from the
Navy).  Catel requested a new project schedule.  DX 311.  The Navy determined that Catel's
request for a new project schedule lacked merit and noted that "all required 'information/
direction' necessary to complete this project ha[d] been provided."  DX 319.  Catel was directed
to "submit a revised completion schedule in accordance with requirements of the contract . . . ."
Id.

Catel maintained that Modification P00008 was "an impossibility to perform."  DX 332.
The Navy, however, directed Catel to proceed with the work set forth in the modification.  DX
317; see also id. (explaining to Catel that "[h]ow . . . work will be accomplished is a performance
requirement of the contract, and thus Catel's responsibility").  Ensign Miller noted that Catel
"should be working expeditiously to complete this project" and identified fifteen items unrelated
to Catel's issues with Modification P00008 that could be immediately addressed.  DX 315; see
also DX 334 (containing a June 26, 1998 letter from the contracting officer to Catel enumerating
contract items that Catel could complete that were not affected by Modification P00008).

Next, the Navy determined that Catel's lightning protection system variation was
unacceptable, indicating that Catel's proposed system "would not provide the desired
protection."  DX 313.  As of late July 1998, issues with the lightning protection system remained
unresolved.  DX 348-49.  Additional discrepancies, including water pressure issues and leaks,
were discovered.  DX 321.  Metal coping that Catel installed did not comply with the contract
specifications and required correction.  DX 324.  The Navy further advised Catel that ladder
work Catel agreed to perform remained incomplete.  Id.; DX 336.  In response, Catel accused the
Navy of imposing terms that were "unfair and greatly in favor of the Government."  DX 326.
Catel then identified work it asserted was "on hold due to a Government generated delay."  DX
331.

Then, in June 1998, a dispute arose concerning a fire-rated access panel to a fan coil unit
described in Modification P00008.  DX 10, 309.  The modification did not specify whether the
access panel was hinged or unhinged.  DX 329.  Catel, claiming that a hinged panel complying
with the Navy's specifications did not exist and could not be fabricated, DX 325, 327, 330,
accused the Navy of "blatant orchestration of a delay" by requiring it to install the panel, DX
328.

The Navy permitted Catel to install a hinged access panel with certain fabrication specifications and clarified the requirements on June 22, 1998.  DX 322, 329-30.  It directed Catel to proceed with installation, DX 329, but Catel again asserted that it was impossible to perform the work, DX 328; see also DX 332 (setting forth Catel's position that the Navy's direction "include[d] material that do[es] not exist").  The Navy requested clarification of Catel's contention that material did not exist to perform Modification P00008.  DX 333.

Catel claimed that it was entitled to an extension of time due to the Navy's purported delays associated with the access panel, stating: "If the Navy has the ability to wave a magic wand and produce a[n] . . . access panel . . . , please do so . . . .  However, if the Navy does not have this ability, . . . the Navy should assign an intelligent and competent representative to review this situation and resolve it . . . ."  DX 342.  The Navy ultimately located the appropriate access panel and informed Catel that it was "not the Government's responsibility to locate material and suppliers for its contractors."  DX 343.

The Navy, on June 25, 1998, issued a show cause letter to Catel:

> Since the issue with the hinged access panel was resolved by the Navy's project manager prior to any of Catel's correspondence, the Contracting Officer can only interpret Catel's actions as a refusal to proceed with . . . the Contracting Officer's formal direction in diligently proceeding with work under this contract.
>
> Because of Catel's refusal to provide the required schedule and refusal to proceed with the work the Government is considering terminating the contract . . . for default . . . .

DX 330.  One day later, the Navy advised Catel that it was in default of its contractual obligation to timely complete the project.  DX 335.  Catel demanded that the Navy retract its June 25, 1998 show cause letter, stating that the Navy had "absolutely no idea what the terms 'good faith' and 'cooperation' even mean" and that "[o]nly someone completely ignorant of the facts or unable to read the English language, or both, could issue the show cause letter . . . ."  DX 342.

### 18.  The Navy's July 20, 1998 Deficiency List

At some point prior to July 20, 1998, Mr. Lawless represented to the Navy that Catel would complete contract performance by July 31, 1998.  DX 347; cf. DX 349 (indicating that the Navy expected Catel to provide an updated schedule for completion by July 31, 1998).  The Navy, on July 20, 1998, furnished to Catel a revised deficiency list identifying 140 items that required Catel's attention.  DX 347.  The list was neither all-inclusive nor a punch list.  Id.  Many of the items were discussed by the parties previously, and the Navy reminded Catel that it was responsible for completing each item on the list.  Id.

### E.  Completion and Correction of Catel's Work

On August 4, 1998, Mr. Robey informed the Navy that Catel "fully and completely satisfied its contractual obligations . . . ."  DX 352.  In a response dated August 7, 1998, the Navy disagreed, noting that it could not conduct a final inspection or set an occupancy date until various tests were completed to confirm compliance with contract requirements.  DX 354; see also DX 362 (indicating that the Navy had difficulty coordinating testing dates with Catel).  The Navy also identified "several contract requirements" that Catel failed to satisfy and indicated that a walk-through inspection had been scheduled to discuss discrepancies.  DX 354.  The Navy noted that Catel's contractual obligations would not be fulfilled until Catel completed all items listed on the punch list.  Id.

### 1.  The Navy's August 1998 Deficiency Lists

On August 11, 1998, the Navy provided to Catel an updated list of known deficiencies.  DX 355-57.  The list contained 106 items and was not deemed a punch list.  Id.  The Navy advised Catel that it would conduct a final inspection of the project once Catel addressed these items.  Id.

Two weeks later, Catel accused the Navy of generating a "fabricated list" in an attempt to "lay a paper trail to try and show that [it was] not proceeding with finishing up and closing out this project."  DX 358.  Catel indicated that most of the items on the deficiency list were completed.  Id.  It also asserted that the remaining items were "minuscule" and did not prevent the Navy from taking occupancy of the Fleet Recreation Center as of August 4, 1998, id., the date Catel asserted that it completed the contract, see DX 352.

The Navy conducted a walk-through inspection on August 26, 1998, and determined that several items Catel claimed were complete were, in fact, not complete and required additional work.  DX 361.  On August 28, 1998, it generated a revised deficiency list, which contained eighty-five items, including thirty new deficiencies identified during the walk-through inspection.  DX 359.  The Navy asserted that "numerous other items" required additional work to make the project satisfactory.  DX 361.  Another walk-through inspection was scheduled for September 10, 1998.  DX 363.

### 2.  The Navy Takes Occupancy of the Fleet Recreation Center

The parties were unable to agree that Catel completed contract performance.  DX 365A, 367, 429, 430.  Following a site meeting on September 16, 1998, the Navy agreed to take occupancy effective September 18, 1998.  DX 365A-66.  The Navy's September 18, 1998 occupancy of the Fleet Recreation Center occurred 363 days after the contract completion date of September 20, 1997, as extended by Modification P00008.  DX 10, 330.

### 3.  Catel Refuses to Complete Work

In letters dated September 17 and September 18, 1998, the Navy indicated that it "would normally not consider a project substantially complete unless all required warranties had been provided," but agreed to take occupancy of the Fleet Recreation Center on September 18, 1998. DX 365A.  The Navy's willingness to take occupancy was based upon an understanding between it and Catel regarding roof warranties and other items.  Id.  The parties initially agreed that Catel would complete several work items by October 5, 1998.  Id.; accord DX 366.

Thereafter, Catel refused to accept these terms unless the Navy agreed to additional conditions.  DX 367.  On September 23, 1998, Catel conveyed to Ensign Miller that it would not perform any additional work at the Fleet Recreation Center.  DX 432.  Catel advised the Navy that it received no payments for work performed during 1998, DX 441, and asserted that the Navy breached the contract, DX 443; see also DX 435 (advising the Navy that "failure to make payment on a timely basis [was] a violation of the Navy's contractual requirements and may render it liable for damages.").  Catel's assertion of nonpayment was "not substantiated" by the Navy's records, which indicated that the Navy issued partial payments on all invoices submitted in 1998 with the exception of the final invoice.  DX 445.  The Navy explained to Catel that "the Liquidated Damages assessed by the Government in accordance with the subject contract and the retention withheld by the Government . . . resulted in no funds available for payment.  The Government's position [was] no breach of contract occurred . . . ."  Id.

### 4.  The Navy Discovers Additional Deficiencies

Although there were no significant structural issues with the Fleet Recreation Center when the Navy accepted occupancy, Tr. 663:10-12 (Miller), the Navy discovered many other deficiencies, id. at 663:4 (Miller); DX 432, 434; see also DX 349 (identifying eleven items that required repair).  Catel remained responsible for correcting punch list and warranty items, Tr. 663:8-10 (Miller), but the Navy's efforts to resolve these issues with Catel were unsuccessful, DX 432-36, 438, 440-45.

On December 10, 1998, the Navy noted that it provided "numerous occasions" for Catel to complete its work and correct deficiencies.  DX 434.  On three separate occasions between December 1998 and February 1999, the Navy advised Catel that it would exercise its rights under the contract's warranty of construction clause to repair and correct deficiencies at Catel's expense.  DX 434, 437, 439.  The Navy, on December 17, 1998, directed Catel to correct several discrepancies by December 22, 1998.  DX 434.  After the deadline passed, Catel's legal counsel protested that the Navy provided "insufficient time" for Catel to correct the discrepancies.  DX 435.

### 5. The Navy Hires Another Contractor

In a February 11, 1999 letter, Catel "accept[ed] the Navy's offer to complete the warranty items" at Catel's expense. DX 441. In the meantime, the Navy took several steps to inspect and documented Catel's work. DX 372-81, 383-86, 389. Ensign Miller then determined whether the work fell within the scope of Catel's original contract and should have been corrected within the one-year warranty period. Tr. 665:21-25 (Miller). Incomplete work included: (1) repairing and replacing five square feet of poorly installed vinyl composite tile ("VCT") in the locker room; (2) replacing an inadequate expansion joint cover; (3) repairing and replacing 900 square feet of poorly installed VCT in the game room; (4) adjusting a closet door to ensure proper closure; (5) repairing and replacing malfunctioning closet door hardware; (6) repairing and replacing five square feet of poorly installed VCT on a stairwell; (7) securing loose stair treads; (8) repairing roof leaks and replacing stained ceiling tiles; (9) resealing an aluminum door and glass to prevent water penetration; (10) removing insulation foam from windows and glass block; (11) installing a fuel tank cap; (12) installing door rain caps on all exterior doors; (13) caulking the exterior building perimeter at soffit/wall/exterior insulation foam joints to prevent moisture penetration; (14) installing an aluminum cover for an exterior expansion joint gap; (15) repairing and replacing 350 square feet of water-damaged VCT; (16) repairing and replacing water-damaged subflooring; (17) repairing first floor concrete subflooring; and (18) repairing and replacing a damaged hot water coil. DX 389. All of these items "were the responsibility of Catel to perform under [its] original contract," with the exception of one additional item, which cost $500, that Ensign Miller determined was the Navy's responsibility to correct. Id.; Tr. 666:6-16 (Miller).

The Navy contracted with H & S Construction and Mechanical, Inc. ("H&SCM") to troubleshoot and repair the heating and air conditioning system. DX 372, 374; Tr. 922:22-25 (Tinari). Thereafter, the Navy modified its contract with H&SCM to include additional work that Catel either failed to perform or completed incorrectly. DX 372, 446; Tr. 923:4-6 (Tinari). The work H&SCM performed consisted of repairs, corrections, and warranty work items that Catel did not perform under its original contract. DX 389. H&SCM also performed the additional item the Navy determined it was responsible to correct. Id. The total cost of the Navy's contract with H&SCM was $26,137, DX 372, 386, and the Navy held Catel responsible for $25,637 of those costs, DX 389. H&SCM's contract performance continued into April 1999. DX 381.

### F. Disputes Between Catel and Its Subcontractors

Within the construction industry, the prime contractor generally specializes in one particular area and performs work within that speciality. Tr. 647:9-14 (Miller). The prime contractor then hires subcontractors to perform work in areas in which it does not specialize. Id. at 647:13-16 (Miller). It is therefore common within the construction industry for a general contractor to hire several subcontractors to perform specialized work. Id. at 647:15-17 (Miller).

**1. Navy Protocol Concerning Disputes Between a Prime Contractor and Its Subcontractors**

When the Navy receives a complaint from a subcontractor, it requests that the subcontractor submit the complaint in writing. Id. at 914:23-24 (Tinari). Next, the Navy refers the subcontractor to the prime contractor's surety. Id. at 647:21-648:2 (Miller). The Navy also informs the contractor that it is aware of the subcontractor's complaint and expects the parties to resolve any issues in order to "maintain progress on the job." Id. at 648:3-7 (Miller); accord DX 63, 78, 151, 173. The Navy has an obligation to inquire into any issue that affects project completion and "try to mediate a solution." Tr. 915:5-12 (Tinari). The Navy followed this procedure during its administration of the Fleet Recreation Center project. Id. at 649:3-650:19 (Miller).

**2. Subcontractor Complaints Against Catel**

The level of subcontractor complaints against Catel was considerably high. Neither Ensign Miller nor Mr. Tinari worked on projects involving such a significant number of subcontractor complaints against the prime contractor. Id. at 648:17-22 (Miller), 914:11-12 (Tinari). Subcontractor complaints against Catel "all revolved around the fact that [they] had performed work for Catel and had received no payment for the work that was performed." Id. at 648:25-649:2 (Miller).

Three subcontractors notified the Navy in March 1997 that Catel failed to pay them for work performed. DX 60, 62-63, 67. In May 1997, Catel's truss subcontractor apprised the Navy that it furnished and installed materials but never received payment. DX 76, 78; see also DX 87 (indicating that the nonpayment issue had been resolved). Then, in September 1997, two subcontractors notified the Navy about their inability to obtain payment from Catel. DX 121, 138, 415. Another dispute arose between Catel and a subcontractor in September 1997. DX 409.

The Navy became aware of more subcontractor complaints in October and November 1997. One dispute with Catel's glass block subcontractor remained ongoing in June 1998. DX 163, 171, 173, 264, 266, 293, 298, 304. Another subcontractor dispute was unresolved as of May 1998. DX 181, 184, 259, 263, 302. Additionally, Catel's acoustical ceiling subcontractor contacted the Navy to express "concern[] . . . that numerous contractors [we]re having payment problems and [were] walking off the job." DX 210, 213. In December 1997, Mr. Dattoli notified the Navy that Catel never compensated him for his work as an alternate quality control manager/superintendent. DX 216, DX 221-22.

Subcontractor disputes with Catel continued throughout 1998. Two subcontractors notified Catel in January 1998 that they would not deliver materials until Catel resolved outstanding account balances. DX 247, 249. In February, another subcontractor threatened legal action against Catel. DX 260-61 (advising Catel that its purported attempts to interfere with the filing of a subcontractor claim constituted "tortious interference with economic advantage" under New Jersey law).

34

### a. Allied

The Navy became aware of a significant dispute between Allied and Catel in September 1997.  DX 138.  According to Allied, it completed eighty-five percent of its work but never received payment from Catel for any materials or labor it furnished.  Id.  Although Allied required only a few additional days to complete its work, Tr. 652:5-6 (Miller), Allied halted shipment of materials to Catel and advised the Navy that it would perform no additional work until it received payment, DX 138.

Allied informed the Navy that Catel could not complete the Fleet Recreation Center roof without utilizing Allied and its materials.  Id.  The Navy was concerned about the critical nature of the work Allied needed to complete.  Tr. 652:20-21 (Miller).  Facing the possibility of several additional weeks of delays, Tr. 652:21-23 (Miller), Ensign Miller attempted to mediate the dispute so that the project could remain on schedule.  DX 152-53.

Catel accused Allied of breach of contract and Ensign Miller of "unwarranted meddling" in the dispute.  DX 141; see also DX 414 (recommending that the Navy "stay completely out of the Catel/Allied dispute" if it was "interested in getting [the] project completed as quickly as possible").  Thereafter, the Navy ceased any effort to mediate and cautioned Catel that critical work needed to be completed promptly.  DX 152.  Allied was willing to complete its work at the Fleet Recreation Center once it received payment from Catel.  DX 402.  Catel, however, continued to refuse payment.  See Tr. 653:24-25 (Miller) (noting that Allied and Catel could not resolve their dispute).

Allied eventually removed roofing materials it brought to the job site, and Catel hired another roofing subcontractor.  Tr. 654:5-6, 9-13 (Miller).  Architectural Design Panels, Inc. ("ADP"), which was the exclusive dealer for the roofing system Allied began installing at the Fleet Recreation Center, advised the Navy that Catel would void all warranties on the roofing system if it used another contractor to finish the job with material that had not been furnished by or through ADP.  DX 176.  ADP also indicated that it would not warranty any work until Catel submitted payment.  Id.; DX 189.  Later, in August 1998, Ranger demanded that Plato Construction, Inc., the subcontractor that apparently completed the roofing system, furnish a warranty.  DX 364.

### b. Coffey Electric, Inc.

The Navy also became aware of a dispute between Mr. Coffey and Catel.  On October 8, 1997, Mr. Coffey advised the ROICC office that he would no longer be working on the Fleet Recreation Center project because he had not been paid for work performed.[4]  DX 143.  Mr.

---

[4]  Other evidence in the record–a certification purportedly signed by Mr. Coffey–indicates that the Navy demanded that Mr. Coffey write the letter and cite nonpayment as the reason Coffey Electric, Inc. was terminating work at the Fleet Recreation Center.  PX 102.

Coffey explained: "[I]t is our belief that Catel Inc. has no intention of paying its sub contractors [sic] the moneys owed them . . . .  We come to this opinion based on statements made by officers of Catel and do not wish to do business with such individuals."  DX 143; accord DX 401; see also Tr. 970:16-20 (Coffey) (explaining that Mr. Coffey "did a good amount of work" but had not received payment from Catel and stating that he "wasn't fond of the way [Mr. Golaszewski] and Catel, Inc. conducted their business"), 971:10-14 (Coffey) (noting that Catel did not remit any payments for work performed).  He indicated that he could not complete work "at an earlier date because the building was not water tight and new interior electrical wiring [could] not be installed . . . until the structure [was] water tight."  DX 143.  Mr. Coffey requested permission to remove his tools and uninstalled materials from the job site.  Id.; DX 401.

Two days later, Mr. Coffey returned to the Fleet Recreation Center job site to retrieve his tools and other materials.  DX 401; Tr. 974:7-11 (Coffey).  According to Mr. Coffey, Mr. Golaszweski denied him access and indicated that the tools now belonged to Catel.  Id. at 974:12-14 (Coffey).  Thereafter, Navy security personnel escorted Mr. Coffey to the job site so that he could remove his tools.  Id. at 974:15-18 (Coffey).  Mr. Coffey discovered that the locks were cut off his gang box and all materials were missing.  Id. at 974:19-20 (Coffey), 975:21-24 (Coffey) (testifying that "the locks had been cut off the box," the "chain had been cut," and the "gang box had in bold white letters C-A-T-E-L written on the front of it over the top of [his] name").  He also observed the new electrician on the job site utilizing his tools.  Id. at 974:20-21 (Coffey).  Mr. Coffey filed a report, and Mr. Dattoli submitted a statement indicating that Mr. Pires instructed him to cut Mr. Coffey's gang box lock.  DX 158.  Mr. Coffey was ultimately able to retrieve most of his tools.  DX 159; Tr. 978:10-11 (Coffey).

Another incident involved a letter that Mr. Coffey purportedly wrote and submitted to Catel in September 1997.  DX 142; see also PX 102 (containing a certification purportedly signed by Mr. Coffey indicating that he "memorialized" a discussion he had with Navy personnel in a September 1997 letter).  In the letter, Mr. Coffey allegedly accused Navy personnel of making threatening statements.  DX 142.  Specifically, Mr. Coffey purportedly wrote that Navy inspector Tom Copeland "became furious and advised me that Ensign Miller was not happy . . . and . . . he had a lot of power on the base and that 'they could make life very difficult for us.'"  Id.  Mr. Coffey supposedly continued:

> We do not appreciate being threatened, harassed or muscled into doing work we
> are not required to do.  Mr. Kopland [sic] was completely out of line in using his
> or Ensign Miller's authority to threaten a sub-contractor on a government job into
> doing work not contained in the contract for that job.  As you can imagine we
> were completely thrown off guard by these tact[ics] and have in all the years of
> working on government jobs never had such a situation occur.

Id.  Mr. Coffey testified that he did not write the letter, asserting that the signature was not in his handwriting.  Tr. 966:23-967:5 (Coffey).  He stated that he learned about the letter when a Navy inspector brought it to his attention, Tr. 979:18-21 (Coffey), and was not harassed by any Navy

personnel when he performed work at the Fleet Recreation Center, id. at 969:1-3 (Coffey).

According to Mr. Coffey, the Navy's inspector suggested that he "recant" the letter rather than explain that he did not compose it because "to deny wouldn't look good in [the] file or something." Id. at 979:25-980:1 (Coffey). Thereafter, on October 15, 1997, Mr. Coffey wrote to the ROICC office and indicated that the September 1997 letter "was written under duress. We were advised by Telmo Pires[] that he would release our check to us if this letter was written. We would like to recant this letter as it does not clearly depict the actual intent of the conversation." DX 161.

The full extent of Mr. Coffey's dispute with Catel remains unclear. Mr. Coffey's credibility is questionable, compare Tr. 997:10-999:3 (Coffey) (testifying that he was never a party to a lawsuit involving Mr. Pires or Catel), with Pl.'s Request Issuance of Subpoena 2-3 (requesting a subpoena to compel additional testimony from Mr. Coffey and producing evidence that Mr. Coffey was sued for defamation by Catel, Mr. Coffey filed a counterclaim against Catel, and PX 102 may have been executed as part of a litigation settlement), and Mr. Golaszewski's testimony concerning the September 1997 letter was, as the court observed, "all over the map," Tr. 194:8-9 (Golaszewski). Regardless, the Navy was aware of and became entangled in Catel's dispute with Mr. Coffey.

## G. Catel Seeks Payment From the Navy

The Navy's contract with Catel was valued at $579,045 with all modifications. DX 10. The Navy paid to Catel and Ranger $473,614.50 for work Catel performed at the Fleet Recreation Center. Id.; DX 389. It assessed $90,750 in liquidated damages, which were based upon 363 days of additional time required by Catel to perform the contract, against the contract balance. DX 12, 389. The Navy used the remaining contract balance to hire H&SCM in order to correct and complete Catel's work. DX 389. No funds remained under the contract. DX 388.

On February 6, 2003, Catel requested payment from the Navy in the amount of $797,724. DX 387. These costs included payment for work Catel performed, reimbursement for liquidated damages, reimbursement for expenses incurred by Catel from Ranger, legal fees, overhead expenses, and lost profits. Id. Catel claimed that it completed all contractual obligations on August 4, 1998, contract performance was extended due to "design flaws in the original plans and specifications," and delays it encountered resulted from the Navy instructing subcontractors to stop work. Id.

The Navy reviewed Catel's letter and researched its contract files. DX 388. It concluded that Catel's assertions "ha[d] yet to be proven . . . legitimate" and that the monies Catel sought were "not substantiated." Id. The Navy reasoned that "[j]ust because a contractor incurred costs does not mean [it had] to pay them." Id.

### H.  Catel Submits a Certified Claim to the Contracting Officer

On June 3, 2004, Catel submitted to the Navy a certified claim demanding payment in the amount of $529,451.  DX 392.  Catel requested the unpaid balance on the Fleet Recreation Center contract and reimbursement for (1) liquidated damages the Navy assessed since September 15, 1997, (2) expenses Catel incurred from Ranger, and (3) legal fees.  Id.  According to Catel, it suffered damages due to the Navy's "incomplete plans and specs, continued funding problems, [and] interference and harassment from the government."  Id.

The contracting officer issued a final decision denying Catel's claim in its entirety on October 15, 2004.  Id.  First, the contracting officer rejected Catel's assertion that it was entitled to payment for the unpaid balance on the contract, explaining that Catel

> fail[ed] to clearly explain through a critical path analysis or otherwise what specific work was controlling the overall completion of the project, or that any controlling work was being delayed by the matters raised in [its] claim.  [Catel] failed to adequately demonstrate precise periods of time for which the matters raised impacted the completion of the work or prove by a critical path analysis or otherwise a cause-effect relationship between the matters raised in [its] claim and any item of work as they relate to actual project schedules and contractor performance.

Id.  The contracting officer noted that Catel's liability for liquidated damages for the period spanning September 20, 1997, through September 18, 1998, was $90,750.  Id.  He also noted that the Navy incurred $25,637 in costs to repair or replace Catel's unsatisfactory work.  Id.  Consequently, the contracting officer explained, Catel's liability for liquidated damages and the Navy's costs to correct deficient work exceeded the remaining contract balance.  Id.

Second, the contracting officer noted that Catel's request for reimbursement for liquidated damages duplicated its request for payment of the remaining contract balance because "the withholding for liquidated damages was from the remaining contract balance."  Id.  Consequently, Catel's request for reimbursement of liquidated damages was denied.  The contracting officer also determined that Catel failed to demonstrate any basis for an equitable adjustment in the contract price for (1) costs incurred by Catel from Ranger and (2) its legal fees.  Id.  As a result, these requests were both denied.  Id.

The Navy provided to Catel a copy of the contracting officer's final decision via facsimile and certified mail.  Id.  Catel was advised of its rights to appeal the contracting officer's final decision to the Armed Services Board of Contract Appeals within ninety days or file suit in the Court of Federal Claims within twelve months.  Id.

## I. The Instant Complaint

Catel filed a complaint in the Court of Federal Claims on October 17, 2005.  Catel alleges that "various Government caused delays" prevented it from timely completing the contract, Compl. ¶¶ 8-12, and the Navy refused to take occupancy of the Fleet Recreation Center "for several months," id. ¶ 14.  Catel also alleges that the Navy refused to pay its final invoice, id. ¶¶ 15-16, and that it is entitled to an award of $529,451 consisting of (1) payment for uncompensated work Catel performed and (2) reimbursement for liquidated damages, expenses incurred by Catel and Ranger, and legal fees, id. ¶¶ 18, 20.

## II. JURISDICTION

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case").  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act confers upon the Court of Federal Claims jurisdiction "to render judgment upon any claim by or against . . . a contractor arising under" the CDA.  28 U.S.C. § 1491(a)(2) (2006).  "Under the CDA, this Court's jurisdiction is predicated upon a contractor meeting two fundamental requirements: (1) the submission of a written claim to the contracting officer and (2) the agency's issuance of a final decision."  OK's Cascade Co. v. United States, 87 Fed. Cl. 739, 745 (2009); see also James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996) ("[F]or the court to have jurisdiction under the CDA, there must be both a valid claim . . . and a contracting officer's final decision on that claim.").

If a contractor has a dispute with the government "relating to a contract," 41 U.S.C. § 7103(a)(1), then the contractor must submit a written claim to the contracting officer within six years after the accrual of the claim, id. § 7103(a)(4)(A).  A contractor must certify claims exceeding $100,000.  Id. § 7103(b).  Thereafter, the contracting officer must issue a decision "within a reasonable time," after having considered factors such as the "size and complexity of the claim" and the "adequacy of the information in support of the claim."  Id. § 7103(f)(3); see also L & D Servs., Inc. v. United States, 34 Fed. Cl. 673, 677 (1996) (construing former 41

U.S.C. § 605(c) and explaining that the CDA "establishes maximum periods within which a contracting officer must issue a decision on a claim–either within 60 days or within a reasonable time."). The contracting officer's decision must be in writing, "state the reasons for the decision reached," and "inform the contractor of [its] rights . . . ." 41 U.S.C. § 7103(d)-(e).

The decision of the contracting officer is final unless the contractor makes an authorized appeal. Id. § 7103(g). A contractor may appeal a contracting officer's decision to the Court of Federal Claims. Id. § 7104(b)(1); see also Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993) ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon."), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1572 (Fed. Cir. 1995) (en banc). The appeal must be filed "within twelve months from the date of the receipt" of the contracting officer's determination. 41 U.S.C. § 7104(b)(3); see Quillen v. United States, 89 Fed. Cl. 148, 151 (2009) (explaining the noteworthiness of the term "twelve months," rather than "one year" or "365 days" and holding that the statutory period "should be calculated as twelve calendar months instead of 365 days").

Defendant does not challenge this court's jurisdiction. The contracting officer issued a final decision on Catel's claim on Friday, October 15, 2004. DX 392. The Navy provided to Catel a copy of the final decision via facsimile and certified mail. Therefore, Catel received the final decision, at the earliest, on October 15, 2004. Catel then timely filed suit on Monday, October 17, 2005. See 41 U.S.C. § 7104(b)(3); RCFC 6(a)(1)(C) (providing that, if the last day of a period of time "is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday"). The court has jurisdiction over Catel's complaint.

### III. CATEL'S CLAIM

Catel's claim consists of three main components: (1) reimbursement of $54,250 for liquidated damages assessed by the Navy; (2) reimbursement of $345,483 for expenses Catel incurred due to Ranger's participation in performance of the Fleet Recreation Center contract; and (3) payment of $105,430 "for work performed but not paid for by the Navy." Compl. ¶ 18. Catel also seeks payment of $24,288 for its legal fees. Id.

### A. Standard of Review

Pursuant to the CDA, the court reviews the contracting officer's decision de novo. 41 U.S.C. § 7404(b)(4). Contract interpretation is reviewed as a matter of law, and the court accords no deference to the interpretation adopted by the agency. Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). Where the United States is a party to the contract, the Court of Federal Claims applies general rules of contract interpretation, giving the terms of the contract "their customary and accepted meaning." Scott Timber Co. v. United States, 333 F.3d 1358, 1366 (Fed. Cir. 2003) (citing Alaska Lumber & Pulp v. Madigan, 2 F.3d 389, 392

(Fed. Cir. 1993)).

## B. Reimbursement of Liquidated Damages

The total contract price, including all modifications, was $579,045.  DX 392.  Catel received payments totaling $473,614.50 from the Navy, leaving a remaining contract balance of $105,430.50.  Id.  The Navy determined that Catel was liable for $90,750 in liquidated damages for the period spanning September 20, 1997, through September 18, 1998, and deducted that amount from the remaining contract balance.  Id.

Catel's request for reimbursement of liquidated damages is subsumed by its request for payment of the remaining contract balance.  The contract balance was withheld, in part, because the Navy assessed liquidated damages.  See id. (explaining that Catel's request for a refund of liquidated damages was duplicative of its request for payment of the contract balance because "the withholding for liquidated damages was from the remaining contract balance").  Catel is not entitled to recover both the remaining contract balance and the liquidated damages assessment because doing so would yield a double recovery.  Accordingly, the court considers Catel's request for a refund of liquidated damages as part of its request for payment of $105,430 under the contract "for work performed but not paid for by the Navy," Compl. ¶ 18, and not a separate component of its claim.  See infra Part III.D.

## C. Costs Incurred Due to Ranger's Participation in Contract Performance

Next, Catel seeks "reimbursement for expenses incurred . . . from Ranger . . . ."  Compl. ¶ 18.  Ranger agreed to serve as Catel's surety and issued performance and payment bonds. DX 305.  Both the performance and payment bonds named Catel as the principal and the United States as the obligee.  Id.

The ROICC office recommended that NAVFAC terminate Catel's contract for default. DX 182, 185, 198-200.  In November 1997, the Navy and Ranger's agent, SOS, met at NAVFAC to discuss Catel's contract performance.  DX 207.  The Navy agreed that it would not terminate the contract for default provided that Ranger became involved with and managed the Fleet Recreation Center project until construction was complete.  DX 252.  Catel acknowledges that it avoided termination for default "only by accepting management of its performance by its surety." Pl.'s Post-Trial Br. 11.  Yet, Catel does not allege that it accepted this condition under duress, and the evidence indicates that Catel willingly accepted this condition when it, the Navy, and Ranger executed Modification A00007.  The parties agreed that Catel would remain the contractor of record, DX 214, even though Modification A00007 changed the contract payee from Catel to Ranger, DX 9.  Ranger managed the project from late November 1997 until September 1998, during which time it retained Cashin to monitor contract completion and assist Catel.  Id.; DX 214, 252.

41

It is undisputed that Ranger participated in performance of the Fleet Recreation Center contract, but Catel has not demonstrated entitlement to reimbursement for any costs it purportedly incurred for or on behalf of Ranger.  Catel presented an invoice enumerating "payments made by Ranger . . . on the bond issued for Catel," PX 27, but Mr. Pires failed to identify any provision in the bond obligating Catel to pay Ranger or demanding that Catel remit any payment to Ranger, Tr. 516:3-9 (Pires).  Indeed, Mr. Pires could not explain the substance of many items listed in the invoice, id. at 517:4-529:2 (Pires), and he testified that no other document existed that identified any expenses incurred or paid by Ranger, id. at 526:18-21 (Pires).

The remaining evidence Catel presented does not demonstrate that Catel incurred any of Ranger's contract performance costs.  Catel produced a purported settlement agreement it entered into with Ranger in 1999, PX 96, but Mr. Pires's testimony was unclear with regard to the circumstances surrounding the agreement, see Tr. 499:15-530:25 (Pires).  Mr. Pires also testified that, sometime in 2006 or 2007, he paid to Ranger $45,000 in exchange for the release of a lien Ranger placed upon his residence. Id. at 505:6-15, 506:5-24, 511:6-13 (Pires).  The circumstances surrounding that agreement were also unclear from Mr. Pires's testimony.  Id. at 511:14-514:25 (Pires).  In fact, Mr. Pires could not recall seeing the agreement among Catel's trial exhibits, id. at 507:5-10 (Pires), and he failed to explain why the agreement was not produced at trial, id. at 511:21-25 (Pires).

Mr. Pires testified that he was unaware of "a single document [among the exhibits] that verifie[d] that [Catel] paid Ranger anything with respect to the Fleet Recreation Center contract[.]"  Id. at 505:24-506:4 (Pires).  Moreover, Catel did not produce any witnesses from Ranger to testify.  As a result, Catel has failed to present any evidence indicating that it incurred or is legally obligated to pay Ranger's contract performance costs.  Since Catel has not established entitlement to recovery of any costs purportedly incurred by Ranger, this component of Catel's claim is denied in its entirety.

### D.  The Remaining Contract Balance

Finally, Catel seeks payment of $105,430 under the contract, which, as noted above, includes Catel's liability for $90,750 in liquidated damages.  Catel generally asserts that it is entitled to damages based upon delays caused solely and entirely by the Navy, the Navy's interference with Catel's contract performance, and constructive changes to the contract.  Pl.'s Post-Trial Br. 9-11.  Catel's assertions, however, are without merit.  Furthermore, the Navy was entitled to assess–and properly assessed–liquidated damages against Catel and was entitled to withhold–and properly offset–monies that equaled the costs the Navy incurred to correct and complete Catel's work under the contract.

**1.  Catel Has Not Demonstrated That Contract Performance Delays Were Excusable**

Catel attributes the contract performance delays entirely to the Navy.  According to Catel, it was "at all times ready, willing, and able to perform its work under the Contract[]; however, it was unable to perform due to the Government's failure [to provide] accurate building plans and specifications . . . [and] the Government's repeated modification of the nature of the work to be performed . . . ." Id. at 10.  Catel asserts that the Navy is financially responsible "for forcing Catel to accept the consequences of its damanded change in the manner and method of Catel's performance." Id. at 11.

In essence, Catel argues that its failure to complete the Fleet Recreation Center by the September 20, 1997 completion date was the result of excusable delay and that it was entitled to additional time to complete the contract because "the delay resulted from unforeseeable causes beyond [its] control and without [its] fault or negligence . . . ." Id. at 10.

The government has the initial burden of establishing that a contractor did not substantially complete contract performance by the contract completion date.  George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 243 (2005).  Once that burden is met, the burden shifts to the contractor, which must prove that "the delay was excusable under the terms of the default provision of the contract." Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. 110, 132 (2001).  The default clause set forth in FAR 52.249-10 was incorporated into the Fleet Recreation Center contract.  See DX 12.  FAR 52.249-10(b) provides that a contractor shall not be terminated or charged with damages if:

> (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.  Examples of such causes include . . . acts of the Government in either its sovereign or contractual capacity . . . ; and

> (2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay.

48 C.F.R. § 52.249-10.

"A contractor seeking to prove the government's liability for a delay must establish the extent of the delay, the contractor's harm resulting from the delay, and the causal link between the government's wrongful acts and the delay." Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1295 (Fed. Cir. 2000); accord Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 424 (1993) (requiring that the contractor show the delay (1) was of an "'unreasonable length of time," (2) was proximately caused by the government's actions, and (3) caused injury to the contractor). The unforeseeable cause must delay the overall contract completion, i.e., impact the critical path of performance.  Sauer Inc. v. Danzig, 224 F.3d 1283, 1345 (Fed. Cir. 2000); see also R.P.

Wallace, Inc. v. United States, 63 Fed. Cl. 402, 409 (2004) (explaining that the contractor must establish the extent to which completion of the contract work as a whole was delayed); Mega Constr. Co., 29 Fed. Cl. at 424 ("[T]here must be delay of an activity on the critical path for there to be project, or compensable, delay."). In addition to proving that the excuse was beyond its control, without its fault or negligence, and unforeseeable, the contractor must prove that it took reasonable action to perform the contract "notwithstanding the occurrence of such excuse." Int'l Elecs. Corp. v. United States, 646 F.2d 496, 510 (Ct. Cl. 1981).

"[N]ot all delays are excusable, and furthermore, not all excusable delays are compensable." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl. Ct. 474, 476 (1990). For example, a contractor cannot recover for concurrent delays because "no causal link can be shown: A government act that delays part of the contract performance does not delay 'the general progress of the work' when the 'prosecution of the work as a whole' would have been delayed regardless of the government's act." Essex Electro Eng'rs, Inc., 224 F.3d at 1295 (quoting Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 714-15 (1944)). The contractor can, however, recover if it proves that the government's delay was separate and distinct from its own delays. William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984) (explaining that courts "will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government"); accord CJP Contractors, Inc. v. United States, 45 Fed. Cl. 343, 372 (1999) (explaining that, in the event of concurrent delays, the contractor "can attempt to prove the portion of the delay attributable to the government[] that was separate and apart from the contractor's delay"). Ultimately, "[o]nly if the delay was caused solely by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." Weaver-Bailey Contractors, Inc., 19 Cl. Ct. at 476 (citing William F. Klingensmith, Inc., 731 F.2d at 809).

Additionally, a contractor cannot demonstrate excusable delay based upon a "total time theory." Morganti Nat'l, Inc., 49 Fed. Cl. at 134. Under the "total time theory," a contractor asserts that wrongful government action contributed to delayed contract completion and

> simply takes the original and extended completion dates, computes therefrom the intervening time or overrun, points to a host of individual delay incidents for which defendant was allegedly responsible and which "contributed" to the overall extended time, and then leaps to the conclusion that the entire overrun time was attributable to defendant.

Law v. United States, 195 Ct. Cl. 370, 382 (1971). A contractor cannot rely upon the "total time theory" to demonstrate excusable delay because the theory "assumes that the government is responsible for all of the delay." Morganti Nat'l, Inc., 49 Fed. Cl. at 134; see also Fireman's Fund Ins. Co. v. United States, 92 Fed. Cl. 598, 669 n.88 (2010) ("It is well settled that this 'total time' theory of proving delay is insufficient to meet the contractor's burden to prove that government-caused delay actually delayed the overall completion of the project.").

Catel has not demonstrated entitlement to damages based upon excusable delay. It fails to make any showing that construction delays were caused by or were attributable to the Navy. Moreover, Catel fails to establish the extent of the delay, the harm Catel incurred as a result of the delay, and any casual link between the Navy's actions and the delay. Catel makes no specific showing that the delays were unforeseeable and beyond its control, and it provides no critical path analysis or identifies any specific period of delay.

Instead, Catel generally asserts–without elaboration or explanation–that "[n]one of the delays . . . [was] attributable in any way to Catel's actions or inactions." Pl.'s Post-Trial Br. 10. This statement is wholly insufficient to establish excusable delay and instead evidences Catel's complete reliance upon the "total time" theory. The "total time" theory, however, cannot be used to meet Catel's burden of proving that the Navy delayed its performance. See Law, 195 Ct. Cl. at 382; Fireman's Fund Ins. Co., 92 Fed. Cl. at 669 n.88; Morganti Nat'l, Inc., 49 Fed. Cl. at 134.

Furthermore, Catel fails to present any critical path analysis to support its contention that the Navy was responsible for delay. The critical path is "a way of grouping interrelated activities in a construction project. Wilner v. United States, 24 F.3d 1397, 1399 n.5 (Fed. Cir. 1994). A delay to an activity on the critical path "usually results in a corresponding delay to the completion of the project." Id. A "critical path method analysis [is] 'an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects." Mega Constr. Co., 29 Fed. Cl. at 425. The United States Claims Court explained:

> The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path had an impact upon the time in which the project was completed. If work on the critical path was delayed, then the eventual completion date of the project was delayed. Delay involving work not on the critical path generally had no impact on the eventual completion date of the project.

G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 728 (1984). Thus, the court "cannot rely on assertions of a contractor, not supported by a critical path analysis of the project, to award critical path delay costs." Mega Constr. Co., 29 Fed. Cl. at 435.

The evidence overwhelmingly demonstrates that Catel was solely responsible for project delays. Catel's contract performance was wrought with delays. In fact, Catel failed to timely commence construction in June 1996. DX 23. Instead, Catel did not begin work on the Fleet Recreation Center until August 1996. DX 19.

Catel's inability to timely transmit submittals, report logs, and progress schedules to the Navy plagued its performance throughout construction. DX 30, 32, 73, 80, 84, 92, 108, 118, 123, 147, 192, 204, 234, 241, 246, 316, 339. Catel lacked a sufficient and consistent quality control program, frequently utilized inexperienced alternate quality control managers to substitute for Mr. Golaszewski, violated the contract provisions by exceeding the amount of time

45

an alternate quality control manager could substitute for Mr. Golaszewski, and failed to submit proper documentation to the Navy.  DX 29, 35, 50, 51, 81, 94, 86, 92, 96, 134, 147, 166, 216, 235, 254, 256, 382.  Catel also failed to provide an adequately sized workforce on the job site, which prevented the project from being completed on time.  DX 147.  Ranger's participation in the project did not adequately address or correct these issues.  DX 232.  Instead, Ranger's participation enabled Catel to attribute its own delays to another entity.  DX 253.

The evidence demonstrates that Catel failed to properly manage the project and instead accused the Navy of mismanagement.  Catel asserts that Ensign Miller delayed the project by "issuing directions to Catel's painting subcontractor, repeatedly changing the paint colors," Pl.'s Post-Trial Br. 6, and it repeatedly accused the Navy of delaying construction, DX 244, 251, 268, 271, 311-12, 315, 325.  However, it was Catel's failure to comply with the contract that resulted in performance delays.  For example, Catel instructed its painting subcontractor to utilize the wrong interior wall paint color.  Tr. 656:20-25 (Miller).  As a result, Catel proceeded with the work at its own risk.  DX 145-46.  Although the MWRD agreed to accept the wrong wall color, it sought to change the paint color for the interior doors, frames, staircase railings, and other trim.  DX 144.  Catel inexplicably refused to wait for the MWRD to make its selection and instead directed its painting subcontractor to use an unapproved color.  DX 146.  Catel was then required to correct its work, resulting in additional delays to contract completion.  DX 148.

Catel also delayed its own performance by failing to resolve subcontractor disputes.  Each subcontractor's complaint centered upon Catel's refusal to pay for work performed, DX 60, 62-63, 67, 76, 78, 93, 138, 142-43, 152, 158-59, 161, 163, 171, 173, 176, 181, 184, 189, 210, 216, 221-22, 247, 249, 259-61, 263-64, 266, 284, 293, 298, 302, 304, 401-02, 409; Tr. 648:25-49:2 (Miller), and neither Ensign Miller nor Mr. Tinari worked on a project that involved such a high number of subcontractor complaints, Tr. 648:17-22 (Miller), 914:11-12 (Tinari).  The Navy attempted to mediate the dispute between Catel and Allied in an effort to prevent further construction delays, DX 152-53, but its efforts were unsuccessful.  The Navy was responsible for neither any of the disputes between Catel and its subcontractors nor the delays that occurred as a result of those disputes.

The structural steel elevation and parapet wall issues best exemplify the extent to which Catel bears sole responsibility for construction delays on the Fleet Recreation Center project.  Catel's subcontractor installed the steel at the wrong elevation, DX 33, 200, and Catel waited until December 1996, approximately two months later, to inform the Navy of the issue, DX 33, 44, 200.  Although Catel was contractually obligated to inspect all drawings, verify calculations, and notify the contracting officer of any discrepancies prior to performing work, DX 12, it did not perform these tasks.  The specifications contained one isolated typographical error, and the correct elevation was indicated elsewhere throughout the plans and specifications.  DX 33, 53, 61, 512.  Nevertheless, Catel failed to coordinate the work in accordance with the "complete set of plans and specifications," DX 61, or clarify the issue with the Navy.  Instead, it authorized improper work based upon the typographical error.  Catel's failure to identify the discrepancy and address it before work commenced caused significant delays, as did Catel's numerous

46

attempts to justify its actions and blame the Navy.  DX 55-56, 59.  Ultimately, the issue could have been easily avoided.  DX 58.

The Navy issued a letter of direction to Catel on April 2, 1997, instructing Catel to proceed with work necessary to compensate for the parapet wall shortfall.  DX 69.  Catel did not comply with the letter of direction and instead further delayed work on the project.  On May 23, 1997, the Navy issued a second letter of direction, which again instructed Catel to proceed with the parapet wall work.  DX 75.  Catel refused to commence work, instead claiming that the letters of direction were "nonapplicable."  DX 77.  In mid-June 1997, Catel still had not begun parapet wall work.  DX 93.

On June 18, 1997, the Navy and Catel finally agreed that they would each bear fifty percent of the costs associated with correcting the steel elevation and parapet wall shortfall issue.  DX 97.  Three weeks later, the Navy issued Modification P00005, which increased the contract price and extended the performance period by an additional forty-four days, DX 7, 66, 68, 70, 79, even though the Navy previously extended the contract by 124 days in order to accommodate Catel's request for additional time to remedy the structural steel elevation discrepancy, DX 5, 512.  Rather than begin work, Catel challenged the time extension set forth in Modification P00005.  DX 104.  Although Catel continually maintained that Modification P00005 established an unrealistic contract completion date, id., Catel inexplicably delayed work on the parapet walls until more than 100 days after the Navy issued its first letter of direction and more than three weeks after the Navy issued Modification P00005, DX 106, 111, 147.  By delaying this work, Catel violated the contract's disputes clause, which required it "proceed diligently with performance . . . pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer."  48 C.F.R. § 52.233-1(i).

Catel's refusal to comply with the Navy's letters of direction significantly delayed completion of the Fleet Recreation Center contract.  As of August 1997, roof installation remained incomplete.  DX 115.  As a result, interior work could not be performed because the building was not water tight.  Id.; Tr. 626:22-627:1 (Miller).  Catel's dispute with Allied, which completed approximately eighty-five percent of its work on the roof but abandoned the project due to nonpayment by Catel, DX 138, exacerbated ongoing construction delays, and the roof was not completed until October 1997.  DX 147.

In short, the evidence introduced at trial overwhelmingly demonstrates that the Navy previously compensated Catel for several delays and afforded Catel significant time to complete contract performance.  Catel, however, was solely responsible for delayed completion of the contract by failing to coordinate construction, refusing to follow the Navy's directions, attributing blame to the Navy and Ranger for Catel's own errors, mismanaging the project, and disputing matters with its subcontractors.  As a result, Catel's request for money damages based upon excusable delay is denied.

**2.  Catel Has Not Established That the Navy Breached the Implied Duty of Good Faith and Fair Dealing or Acted in Bad Faith**

Next, Catel argues that it is entitled to money damages because the Navy breached the implied duty of good faith and fair dealing.  Pl.'s Post-Trial Br. 10.  In addition to obligations expressly set forth in a contract, each party is bound to its contracting partner by a common law "covenant of good faith and fair dealing."  Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  "The duty of good faith and fair dealing is inherent in every contract," Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 828 (Fed. Cir. 2010), and applies to the United States as it does to any other party, First Nationwide Bank v. United States, 431 F.3d 1342, 1349 (Fed. Cir. 2005).  Each party has the duty "'to do everything that the contract presupposed should be done by a party to accomplish the contract's purpose.'"  Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1365 (Fed. Cir. 2009) (quoting 30 Richard A. Lord, Williston on Contracts § 77.10 (4th ed. 1999)).  Therefore, parties must refrain from actions that "hinder or delay the other party in performance of the contract," Luria Bros. v. United States, 369 F.2d 701, 708 (Ct. Cl. 1966), or "destroy the other party's reasonable expectations regarding the fruits of the contract," Centex Corp., 395 F.3d at 1304; see also First Nationwide Bank, 431 F.3d at 1350 ("The covenant of good faith and fair dealing requires a party to respect and implement the contract in accordance with its terms . . . .").

The government "must do whatever is necessary to enable the contractor to perform," Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977), and the implied duty of good faith and fair dealing "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions," Precision Pine & Timber, Inc., 596 F.3d at 831.  Nevertheless, "[n]ot all misbehavior . . . breaches the implied duty of good faith and fair dealing owed to other parties to a contract."  Id. at 829.  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") explained:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation of the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration.  Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract.  The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

Id. (citation omitted).

Government officials are presumed to exercise their duties in good faith.  Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002); Schaefer v. United States, 633 F.2d 945, 948 (Ct. Cl. 1980).  Defendant argues that Catel must overcome this presumption

by proffering clear and convincing evidence of improper motive by Navy employees.  Def.'s Post-Trial Br. 31.  Defendant is correct that clear and convincing evidence is required to show that the Navy acted in bad faith, see Am-Pro Prot. Agency, Inc., 281 F.3d at 1239; Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993); Knotts v. United States, 121 F. Supp. 630, 631 (Ct. Cl. 1954), but this burden of proof does not apply to allegations that the Navy breached the implied duty of good faith and fair dealing, see Rivera Agredano v. United States, 70 Fed. Cl. 564, 574 n.8 (2006) (explaining that "a claim that the government breached the covenant of good faith and fair dealing is not the same as a claim that the government acted in bad faith").  "An allegation of breach of the covenant of good faith and fair dealing is an allegation that the party's contracting partner deprived it of the fruits of the contract and is often motivated by self-interest . . . ."  Id. (citation omitted).  Bad faith, by contrast, "is motivated by malice and does not necessarily result in a deprivation of the fruits of the contract."  Id. (citation omitted).

The Navy did not breach the implied duty of good faith and fair dealing when it entered into, and during the administration of, the Fleet Recreation Center contract.  Catel, however, contends that the Navy "improperly interfer[ed] with Catel's relationships with its subcontractors."  Pl.'s Post-Trial Br. 5; see also Tr. 653:24-654:2 (Miller) (noting that Catel filed a formal complaint against Ensign Miller for "meddling in [its] subcontractor affairs").  The Navy typically does not get involved in contractor and subcontractor disputes, but Ensign Miller, as the project manager, was obligated to inquire into issues that affected project completion and, if possible, mediate a solution.  Tr. 915:5-12 (Tinari).  To that end, Ensign Miller, who expressed concern about the impact Catel's dispute with Allied had upon construction, attempted to mediate the dispute.  Id. at 651:7-654:15 (Miller); DX 152-53.  Allied apprised the Navy of the dispute and Catel's failure to remit payment, and it terminated work on and removed remaining roofing materials from the Fleet Recreation Center as a result of Catel's actions, not any actions taken by the Navy.  DX 138; Tr. 654:5-6 (Miller).  The evidence demonstrates that Ensign Miller acted in good faith by attempting to mediate a resolution and keep the project on schedule.  Catel's bald assertion that the Navy breached the implied duty of good faith and fair dealing because Ensign Miller sought to mediate a dispute is without merit.

Next, Catel argues that the "Government's Inspectors had the ability to tremendously damage the contractors' businesses" and that Catel "tried to fight against this system of inspector domination . . . ."  Pl.'s Post-Trial Br. 10.  Catel fails to cite any act by a Navy inspector that was not performed in good faith or that adversely affected Catel.  Instead, Catel focuses upon the September 1997 letter Mr. Coffey purportedly wrote to Catel recounting harassment by a Navy inspector.  See id. at 7-9.  Mr. Coffey testified that he was never threatened or harassed by the Navy or its inspectors.  Tr. 968:2-969:3 (Coffey).  Although Mr. Coffey's testimony is unreliable, Catel produced no additional evidence and called no other witness to corroborate the statements contained in the September 1997 letter or rebut Mr. Coffey's testimony.

Additionally, Catel makes no showing that the Navy "deprived it of the fruits of the contract" or was "motivated by self-interest" during its administration of the Fleet Recreation Center contract.  Therefore, Catel's arguments that the Navy breached the implied duty of good

faith and fair dealing are unsubstantiated.

Finally, to the extent that Catel alleges that the Navy acted in bad faith, see, e.g., Pl.'s Post-Trial Br. 1 (asserting that the Navy was biased against Catel), Catel's position carries no weight. Catel has not met its "high burden of proof necessary to overcome the presumption of good faith," Am-Pro Prot. Agency, Inc., 281 F.3d at 1238, by proffering clear and convincing evidence of impropriety on the part of the Navy or that the Navy intended to injure Catel. Indeed, Catel proffers absolutely no evidence to support any allegation of bad faith.

In short, Catel's argument that the Navy breached the implied duty of good faith and fair dealing is unsupported by the evidence.  Furthermore, to the extent Catel alleges that the Navy acted in bad faith, Catel has proffered no evidence to support this allegation and failed to rebut the presumption that Navy personnel discharged their duties in good faith.  As a result, Catel's request for money damages based upon these theories is denied.

### 3. Catel Has Not Established That the Navy Made Constructive Changes to the Contract

The court next turns to Catel's assertion that it is entitled to an equitable adjustment because the Navy constructively changed the Fleet Recreation Center contract.  According to Catel, "the Government's failure to provide the accurate building plans and specifications, the Government's repeated modification of the nature of the work to be performed, and the Government's interference with Catel's performance and the Plaintiff's relationships with its subcontractors caused a change in the terms of the Contract."  Pl.'s Post-Trial Br. 9-10.  Catel contends that it is entitled to compensation as a result of these modifications based upon the doctrine of constructive change.  See id.

A constructive change occurs "where a contractor performs work beyond the contract requirements, without a formal order under the Changes Clause, either due to an informal order from, or through the fault of, the government."  NavCom Def. Elecs., Inc. v. England, 53 F. App'x 897, 900 (Fed. Cir. 2002) (citing Ets-Hokin Corp. v. United States, 420 F.2d 716, 720 (Ct. Cl. 1970)).  The United States Court of Claims explained that

> where a contract contains the standard "changes" provision and the contracting officer, without issuing a formal change order, requires the contractor to perform work or to utilize materials which the contractor regards as being beyond the requirements of the pertinent specifications or drawings, the contractor may elect to treat the contracting officer's directive as a constructive change order and prosecute a claim for an equitable adjustment under the "changes" provision of the contract.

Ets-Hokin Corp., 420 F.2d at 720 (citing Jack Stone Co. v. United States, 344 F.2d 370, 376 (Ct. Cl. 1965)).  An equitable adjustment "is a corrective measure used to keep the contractor whole when the government modifies a contract."  Shank-Artukovich v. United States, 13 Cl. Ct. 346,

361 (1987).  A contractor seeking an equitable adjustment bears the burden of proving "'liability, causation, and injury, and it must prove that the government somehow delayed, accelerated, augmented, or complicated the work, and thereby caused the contractor to <u>incur specific additional costs</u>, and that those costs were reasonable, allowable, and allocable to the contract.'" <u>SAB Constr., Inc. v. United States</u>, 66 Fed. Cl. 77, 84-85 (2005) (quoting 64 Am. Jur. 2d <u>Public Works and Contracts</u> § 199 (2004)); <u>see also</u> <u>Delhur Indus., Inc. v. United States</u>, 95 Fed. Cl. 446, 454 (2010) (explaining that the contractor must prove each element by a preponderance of the evidence).

The contractor must establish that the costs it incurred were the result of a constructive change, <u>Teledyne McCormick-Selph v. United States</u>, 588 F.2d 808, 810 (Ct. Cl. 1978), and it must show that the government ordered it to perform additional work, <u>Len Co. & Assocs. v. United States</u>, 385 F.2d 438, 443 (Ct. Cl. 1967); <u>see also</u> <u>Info. Sys. & Networks Corp. v. United States</u>, 81 Fed. Cl. 740, 746 (2008) ("[F]or there to be a constructive change, the contractor must truly be <u>required</u> by the government to perform work beyond the contract requirements . . . ."). Once the contractor proves that the government is liable for the costs of added or changed contract work, "the actual costs incurred by the contractor will provide the measure of the equitable adjustment to the contract price, if those incurred costs are reasonable." <u>George Sollitt Constr. Co. v. United States</u>, 64 Fed. Cl. 229, 245 (2005).  "[T]he measure of an equitable adjustment is the 'difference between what it cost to do the work and what it would have cost it if the unforeseen conditions had not been encountered.'" <u>Shank-Artukovich</u>, 13 Cl. Ct. at 361 (quoting <u>Tobin Quarries, Inc. v. United States</u>, 84 F. Supp. 1021, 1023 (Ct. Cl. 1949)).

Catel has not met its burden of proving that the Navy made constructive changes to the Fleet Recreation Center contract.  Catel identifies no work it completed that was beyond the contract requirements, and it does not establish that the Navy compelled it to perform that work. <u>See</u> <u>Info. Sys. & Networks Corp.</u>, 81 Fed. Cl. at 746.  Instead, it asserts, without elaboration or reference to specific evidence, that "repeated modification" of the contract and the Navy's "interference" effectuated contract changes.  Pl.'s Post-Trial Br. 10.  The Navy is authorized to require that contract work be performed in a "reasonable and proper" manner, <u>Len Co. & Assocs.</u>, 385 F.2d at 443, and Catel has not demonstrated that the Navy acted otherwise in its administration of the contract.  Furthermore, Catel has not established that it incurred any costs stemming from the performance of work purportedly outside the scope of the contract.  Rather, Catel generally claims entitlement to money damages.  Pl.'s Post-Tr. Br. 10.  A general claim that the Navy owes Catel an equitable adjustment, however, does not satisfy Catel's burden of proof.

In short, Catel has failed to establish the existence of constructive changes to, or identify additional costs purportedly incurred to perform additional work under, the Fleet Recreation Center contract.  As a result, Catel's request for money damages based upon the doctrine of constructive change is denied.

### 4.  The Navy Properly Assessed Liquidated Damages

Catel challenges the Navy's assessment of $90,750 in liquidated damages against the remaining contract balance.  Liquidated damages are used "to allocate the consequences of a breach before it occurs," Jennie-O Foods, Inc. v. United States, 580 F.2d 400, 412 (Ct. Cl. 1978) (per curiam), which "save[s] the time and expense of litigating the issue of damages," DJ Mfg. Corp. v. United States, 86 F.3d 1130, 1133 (Fed. Cir. 1996).  Liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts."  Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411 (1947).  Therefore, "[w]here parties have by their contract agreed upon a liquidated damages clause as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced."  Jennie-O Foods, Inc., 580 F.2d at 413-14.

The government bears the initial burden of proving that liquidated damages were properly assessed by showing that the contract was not completed by the agreed contract completion date and that liquidated damages were due and owing.  PCL Constr. Servs., Inc. v. United States, 53 Fed. Cl. 479, 484 (2002); see also id. (indicating that the government must show that contract performance was not substantially completed and that the period for which the assessment was made was proper).  The burden then shifts to the contractor, which must show that delays were excusable.  Id.; see also Sauer Inc., 224 F.3d at 1347 ("As a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled.").

The Navy has met its initial burden of proving that liquidated damages were properly assessed by showing that Catel did not substantially complete its contractual obligations by the contract completion date.  Catel was required to complete the Fleet Recreation Center by September 20, 1997.  DX 10.  Catel does not dispute that it did not meet that deadline.  DX 104, 352.  Catel's failure to complete the project on time resulted in the November 17, 1997 meeting between Ranger's agent and the Navy to discuss Ranger's participation in contract management.  DX 214, 252.  The Navy agreed to forbear terminating the contract for default if Ranger agreed to actively participate in the contract's completion.  Id.  Thereafter, the parties executed Modification A00007.  DX 9.

The Navy apprised Catel and Ranger of numerous deficiencies before it took occupancy of the Fleet Recreation Center.  DX 309, 313, 321-22, 324-25, 327, 329-30, 334, 336, 347-49, 355, 357, 359, 361.  Despite the parties' inability to resolve disagreements related to correcting these deficiencies, DX 365A, 367, 429-30, the Navy agreed to take occupancy of the Fleet Recreation Center on September 18, 1998, DX 365A-66.  When the Navy took occupancy of the Fleet Recreation Center, a total of 363 days had elapsed since the contract completion date of September 20, 1997, DX 10, 330.  As a result, the Navy assessed liquidated damages at a rate set forth in the contract–$250 per day–for 363 days, totaling $90,750.  DX 392.

Catel has failed to show that the liquidated damages assessed by the Navy were unjustified.  The Fleet Recreation Center solicitation included the liquidated damages clause set forth in FAR 52.212-5, which indicated that the contractor would be obligated to pay $250 per day for each day beyond the completion date it failed to complete the contract.  DX 12.  Furthermore, as the court explained in Part III.D.1, supra, Catel has failed to show that its delays were excusable.  See Sauer Inc., 224 F.3d 1347; see also Delhur Indus., Inc., 95 Fed. Cl. at 468-69 (determining that the contractor was not entitled to reimbursement of liquidated damages because it did not satisfy its burden of proof by proffering evidence showing delays were excusable).

In short, the Navy assessed liquidated damages against Catel because it failed to complete the Fleet Recreation Center on time and has demonstrated that the assessment was proper and justified.  Catel has not shown that the contract was not completed on time due to excusable delay.  Consequently, Catel is not entitled to recover any liquidated damages assessed against it by the Navy for its failure to complete the Fleet Recreation Center by the contract completion date.

### 5.  The Navy Properly Offset Additional Costs It Incurred to Complete the Fleet Recreation Center Contract

Finally, the Navy offset $14,680.50 from the remaining contract balance because it incurred additional costs to complete and correct Catel's work after it took occupancy of the Fleet Recreation Center in September 1998.  DX 392.  The Navy discovered numerous deficiencies and afforded Catel several opportunities to correct and complete its work.  DX 434.  Ultimately, the Navy and Catel were unable to resolve these issues, and Catel did not complete its work at the Fleet Recreation Center.  Id.; DX 432-33, 435-36, 438, 440-45.

Incorporated into Catel's contract is the warranty of construction clause set forth in FAR 52.246-21.  See DX 12; supra Part I.A.  Between December 1998 and February 1999, the Navy advised Catel that it would exercise its rights under the warranty of construction clause and hold Catel financially responsible for costs it incurred to correct and complete Catel's work.  DX 434, 437, 439.  Catel ultimately accepted what it characterized as the Navy's "offer" to complete warranty items at Catel's expense.  DX 441.

The Navy took numerous steps to inspect and document Catel's work.  DX 372-81, 383-86, 389.  Ensign Miller then determined whether the work that remained incomplete or required correction fell within the scope of the Fleet Recreation Center contract and should have been corrected by Catel within the one-year warranty period.  Tr. 665:21-25 (Miller).  Thereafter, the Navy hired H&SCM to perform the additional work.  DX 374, 446.

Initially, H&SCM's contract involved troubleshooting and repairing the Fleet Recreation Center heating and air conditioning system.  DX 372, 374.  The Navy subsequently modified its contract with H&SCM to include additional items that Catel either failed to perform or

53

completed incorrectly.  DX 372, 446; Tr. 923:4-6 (Tinari).  H&SCM's work consisted of repairs, corrections, or warranty work items that Catel was required to–but did not–perform.  DX 389; see also id. (indicating that, with the exception of one item, "all items listed [in its contract with H&SCM] were the responsibility of Catel to perform under [its] original contract").  DX 389.  The Navy's contract with H&SCM totaled $26,137.  DX 372, 386.  The Navy held Catel responsible for $25,639 of those costs, id., and withheld payment to Catel of $14,680.50, which represented the remaining contract balance after the assessment of liquidated damages.

In United States v. Munsey Trust Co. of Washington, D.C., the United States Supreme Court explained that the "government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'"  332 U.S. 234, 239 (1947) (quoting Gratiot v. United States, 40 U.S. 336, 370 (1841)).  The Federal Circuit has "repeatedly recognized the government's right of set-off," Johnson v. All-State Constr., Inc., 329 F.3d 848, 852 (Fed. Cir. 2003), observing that the government "has long enjoyed the right to offset contract debts to the United States against contract payments due to the debtor," Cecile Indus., Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993); see also J.G.B. Enters., Inc. v. United States, 497 F.3d 1259, 1261 (Fed. Cir. 2007) ("It is undisputed that the government has the right to offset debts owed to its contractor with a debt owed to it by the same contractor absent explicit contractual, statutory, or regulatory language stating otherwise."); McCall Stock Farms, Inc. v. United States, 14 F.3d 1562, 1566 (Fed. Cir. 1993) (recognizing the government's "pre-existing offset rights under the common law"); Dale Ingram, Inc. v. United States, 475 F.2d 1177, 1188 (Ct. Cl. 1973) (recognizing the government's "right of off-set").

The circumstances in this case are not unlike those encountered in Cecile Industries, Inc.  In that case, the Defense Personnel Support Center ("DPSC") contracted to purchase sleeping bags containing a minimum percentage of goose down.  995 F.2d at 1053.  Thereafter, the DPSC discovered that the sleeping bags did not conform to the contract specifications.  Id.  After the contractor failed to remedy the problem, the DPSC terminated the contract for default and withheld payments owed to the contractor under separate contracts it entered into with the contractor as an offset under the sleeping bags contract.  Id.  The Armed Services Board of Contract Appeals upheld the offset, and the Federal Circuit affirmed, id. at 1053-54, explaining that the government "possessed a common law right to offset contractual rights against contractual payments," id. at 1056.

Here, the Navy discovered numerous deficiencies with Catel's performance, and its repeated requests for Catel to the correct work and complete the contract were unsuccessful.  Catel ultimately acknowledged liability for any additional costs the Navy incurred to correct and complete its work.  The Navy hired H&SCM to perform the work, and the costs it incurred exceeded the remaining balance on Catel's contract.  As a result, the Navy offset its additional costs from the remaining contract balance.

The Navy acted in accordance with FAR 52.246-21(c), which was incorporated into Catel's contract, and was authorized to offset the costs it incurred to remedy and complete

54

Catel's work.  Although the Navy withheld $14,680.50, it could have withheld the entire $25,639 it paid to H&SCM if that amount remained available.  In short, the Navy properly offset the additional costs it incurred to remedy work improperly performed or omitted by Catel.

## IV.  CONCLUSION

For the reasons stated above, Catel is not entitled to any additional compensation from the Navy under the Fleet Recreation Center contract.  Accordingly, Catel's claim for money damages against the Navy is **DENIED** in its entirety.  The clerk is directed to enter final judgment in favor of defendant.  No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge